# CONTINENTAL WALL PAPER COMPANY *v.* LOUIS VOIGHT AND SONS COMPANY.

## CERTIORARI TO THE UNITED STATES CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 15.  Argued April 24, 27, 1908.—Decided February 1, 1909.

Where a number of manufacturers situated in different States engaged in manufacturing an article sold in different States, organize a selling company through which their entire output is sold, in accordance with an agreement between themselves, to such persons only as enter into a purchasing agreement by which their sales are restricted, the effect

is to restrain and monopolize interstate and foreign trade and commerce and is illegal under the Anti-Trust Act of July 2, 1890, c. 647, 26 Stat. 209; and so held in regard to a combination of wall paper manufacturers.

While a voluntary purchaser of goods at stipulated prices under a collateral, independent contract cannot avoid payment merely on the ground that the vendor was an illegal combination, *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, a vendee of goods purchased from an illegal combination in pursuance of an illegal agreement can plead such illegality as a defense.

The court cannot lend its aid in any way to a party seeking to realize the fruits of an illegal contract, and, while this may at times result in relieving a purchaser from paying for what he has had, public policy demands that the court deny its aid to carry out illegal contracts without regard to individual interests, or knowledge of the parties.

The refusal of judicial aid to enforce illegal contracts tends to reduce such transactions.

In determining whether a contract amounts to a combination in restraint of interstate trade in violation of the act of July 2, 1890, all the facts and circumstances will be considered. *Addyston Pipe Co.* v. *United States*, 175 U. S. 211, 247.

148 Fed. Rep. 939, affirmed.

THE facts appear in the statement of MR. JUSTICE HARLAN.

Mr. *Louis Marshall*, with whom Mr. *Joseph Wilby* was on the brief, for petitioner:

Assuming, but not conceding, that the organization of the plaintiff was for the purpose of restraining competition, and enhancing prices, the defendants have no defense, under common-law considerations, to the action brought against them to recover for goods sold and delivered.

The illegality of the acts of plaintiff, even if proved, do not absolve the defendants from the legal obligation to pay for goods admittedly bought by them. "A person does not become an outlaw and lose all rights by doing an illegal act." *National Bank & Loan Co.* v. *Petrie*, 189 U. S. 425.

This case is governed by the decision of this court in the case of *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, and

cases there cited. See also, to the same effect, the following: *Edison Electric Light Co.* v. *Sawyer-Man Electric Co.*, 53 Fed. Rep. 598; *American Soda Fountain Co.* v. *Green*, 69 Fed. Rep. 333; *Brown Saddle Co.* v. *Troxel*, 98 Fed. Rep. 620; *National Folding Box and Paper Co.* v. *Robertson*, 99 Fed. Rep. 985; *Otis Elevator Co.* v. *Geiger*, 107 Fed. Rep. 131; *Ocean Ins. Co.* v. *Polleys*, 13 Peters, 164; *Armstrong* v. *American Exchange Bank*, 133 U. S. 467; *Buchanan* v. *Drovers' National Bank*, 55 Fed. Rep. 226; *Morris* v. *Norton*, 75 Fed. Rep. 926; *Phalen* v. *Clark*, 19 Connecticut, 432; *The Charles E. Wisewall*, 86 Fed. Rep. 674; *Phenix Ins. Co.* v. *Clay*, 101 Georgia, 332; *Erb* v. *Insurance Co.*, 98 Iowa, 611; *Niagara Ins. Co.* v. *De Graff*, 12 Michigan, 136; *Tracy* v. *Talmage*, 14 N. Y. 175; *Curtis* v. *Leavitt*, 15 N. Y. 245; *Mandelbaum* v. *Greyovich*, 17 Nevada, 95; *Planters' Bank* v. *Union Bank*, 16 Wall. 500; *Yarborough's Admr.* v. *Avant*, 66 Alabama, 526; *Ware* v. *Curry*, 67 Alabama, 274; *Martin* v. *Hodge*, 47 Arkansas, 378; *National Distilling Co.* v. *Cream City Importing Co.*, 86 Wisconsin, 352; *Minnesota Lumber Co.* v. *Whitebreast Coal Co.*, 56 Ill. App. 248; *Congress Co.* v. *Knowlton*, 103 U. S. 49; *Welch* v. *Wasson*, 6 Gray, 506; *Levin* v. *Chicago Gas Light & Coke Co.*, 64 Ill. App. 393; *Ingraham* v. *National Salt Co.*, 130 Fed. Rep. 676.

Again, assuming that the plaintiff was a trust, and that it could have been lawfully proceeded against, under the act of Congress of July 2, 1900, yet that fact does not prevent the plaintiff from recovering for the goods which it sold and delivered to the defendants.

While the statute declares a trust, or combination, such as the plaintiff is claimed to be, illegal, and subjects every person entering into the combination to fine and imprisonment, and makes adequate provision for its annulment, yet there is nothing in the act, which permits one who purchases goods from such a trust, to despoil it of its property. The Government of the United States is sufficiently powerful to cope with an unlawful monopoly, without legalizing robbery of the char-

acter which the defendants are seeking to perpetrate, through the aid of the courts. *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540; *The Charles E. Wisewall*, 74 Fed. Rep. 802; affirmed, 86 Fed. Rep. 671; *Dickerman* v. *Northern Trust Co.*, 176 U. S. 195; *Lafayette Bridge Co.* v. *City of Streator*, 105 Fed. Rep. 229; *Cincinnati Packet Co.* v. *Bay*, 200 U. S. 179, 185.

Even assuming, that the clause contained in the contract between the plaintiff and the defendants, which prohibited the latter from selling any of the merchandise, purchased from the former, at lower prices than those specified in the schedule annexed, was illegal, the only effect of such illegality would be, to nullify that provision, and not to prevent the plaintiff from recovering for merchandise actually received and kept by the defendants. *Pigot's Case*, 11 Coke Rep. 27*b* (1615), holding that if some conditions indorsed upon a bond, are against law, and some are good and lawful, the covenants or conditions which are against law, are void *ab initio*, and the others stand good. And see Hammon on Contracts, §§ 251 *et seq.;* Anson on Contracts (8th ed.), 206; *Pickering* v. *Ilfracombe Ry. Co.*, L. R. 3 C. P. 235, 250; *United States* v. *Bradley*, 10 Pet. 343; *Hynds* v. *Hays*, 25 Indiana, 31; *Kerrison* v. *Cole*, 8 East, 231; *Gelpcke* v. *City of Dubuque*, 1 Wall. 221; *Gaskell* v. *King*, 11 East, 165; *Erie Ry. Co.* v. *Union Locomotive & Exp. Co.*, 35 N. J. L. 240; *Baines* v. *Gearey*, 35 Ch. Div. 154; *Wallis* v. *Day*, 2 Mees. & W. 273; *Haynes* v. *Doman*, L. R. (1899) 2 Ch. 13; *Oregon Navigation Co.* v. *Winsor*, 20 Wall. 64; *Western U. T. Co.* v. *Burlington & S. W. Ry. Co.*, 11 Fed. Rep. 1; *Presbury* v. *Fisher*, 18 Missouri, 50; *Moore* v. *Bonnet*, 40 California, 251; *Hanauer* v. *Gray*, 25 Arkansas, 350; *Price* v. *Green*, 16 Mees. & W. 346; *Wiley* v. *Baumgardner*, 97 Indiana, 66; *Dean* v. *Emerson*, 102 Massachusetts, 480; *Peltz* v. *Eichele*, 62 Missouri, 171; *United States* v. *Bradley*, 10 Pet. 343, 360, 364; *Trenton Potteries Co.* v. *Oliphant*, 58 N. J. Eq. 507; *S. C.*, 46 L. R. A. 255; *Thomas* v. *Miles*, 3 Ohio St. 274; *Smith's Appeal*, 113 Pa. St. 579.

The principle of these cases is directly in point here. The plaintiff agreed to sell to the defendants certain merchandise

at an agreed price. The latter agreed to pay for the merchandise received the stipulated price, and also agreed that they would not sell such merchandise at a lesser price than that specified in the contract.

Assuming that the latter condition is void, in that event it was not binding upon the defendants; but, as has been seen, such invalidity would not absolve the defendants from liability on their covenant to pay for the merchandise delivered.

*Mr. Orris P. Cobb* and *Mr. Morrison R. Waite* for respondent:

Treating the matter, as it must be treated, as one general scheme, all one agreement, it plainly comes within the common-law inhibition against contracts in restraint of trade, as well as the statutes. *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211; *Swift & Co.* v. *United States,* 196 U. S. 375, 396; *Montague* v. *Lowry,* 193 U. S. 38, 45; *Loewe* v. *Lawlor,* 208 U. S. 274.

The combination was an illegal trust, and an unlawful combination within the meaning of the statutes. *United States* v. *Trans-Missouri Assn.,* 166 U. S. 290; *United States* v. *Joint Traffic Assn.,* 171 U. S. 505; *Montague* v. *Lowry,* 193 U. S. 38; *Northern Securities Co.* v. *United States,* 193 U. S. 197; *Swift & Co.* v. *United States,* 196 U. S. 375; *National Cotton Oil Co.* v. *Texas,* 197 U. S. 115, 129; *United States* v. *Jellico C. & C. Co.,* 46 Fed. Rep. 432; *American Biscuit Co.* v. *Klotz,* 44 Fed. Rep. 721; *Oliver* v. *Gilmore,* 52 Fed. Rep. 562; *C., M. & St. P. R. Co.* v. *Wabash &c. R. R. Co.,* 61 Fed. Rep. 993, 997; *National Harrow Co.* v. *Hench,* 83 Fed. Rep. 36, 38; *S. C.,* 84 Fed. Rep. 226; *United States* v. *Coal Dealers' Assn.,* 85 Fed. Rep. 252; *Cravens* v. *Carter-Crume Co.,* 92 Fed. Rep. 479, 485; *Lowry* v. *Tile & G. Assn.,* 98 Fed. Rep. 817, 826; *S. C.,* 106 Fed. Rep. 38; *Montague* v. *Lowry,* 115 Fed. Rep. 27; *United States* v. *C. & O. Fuel Co.,* 105 Fed. Rep. 93; *C. & O. Fuel Co.* v. *United States,* 115 Fed. Rep. 610; *City of Atlanta* v. *Chattanooga, F. & P. Co.,* 101 Fed. Rep. 900.

The contract between plaintiff and defendant, under which

arises the account sued on, is a part of and directly connected with the illegal combination, and hence, unenforceable, and not merely a collateral or independent contract.

It is clear that this is not a mere case of a sale by a monopoly or a trust to a third person and that the objection raised by the defendant is not the same as that which would be raised by an outsider purchasing from a trust. *Connolly* v. *Union Sewer Pipe Company,* 184 U. S. 540, distinguished.

The fact that the consideration has all been executed on one side cannot alter the matter. There can be no recovery for goods sold and delivered under trust contracts, or any other contract creating an illegal monopoly in restraint of trade. See *Detroit Salt Co.* v. *National Salt Co.,* 134 Michigan, 103; *Arnot* v. *Pittston & Elmira Coal Co.,* 68 N. Y. 558; *Unckles* v. *Colgate,* 148 N. Y. 529, 538; *Clancy* v. *Onondaga Fine Salt Mfg. Co.,* 62 Barb. 395, 405–407; *Houck* v. *Brew. Assn.,* 88 Texas, 184; *Fuqua* v. *Pabst Brew. Co.,* 90 Texas, 298; *Texas Brew. Co.* v. *Templeman,* 90 Texas, 277; *Carriage Co.* v. *Hatch,* 19 Tex. Civ. App. 120.

All the statutes relied on in this case expressly forbid the making of the contracts of which the one between the plaintiff and defendant, set out in the third defense, was a material step; expressly declare the contracts void; and expressly impose a penalty upon the making of them and expressly make them criminal.

Under these statutes such transactions and such contracts are just as illegal as gambling; as contracts to assist in the smuggling of goods; as contracts to deal in futures; as contracts to make and circulate counterfeit money; as the sale of liquor in violation of law; as contracts to assist in prostitution; or in any other way to violate criminal statutes, or in furtherance of such objects.

The cases in which recovery has been denied either of the contract price when suing on the contract or on the common counts ignoring the contract, are numerous. *Ribbans* v. *Crickett,* 1 B. & P. 264, 266; *Bensley* v. *Bignold,* 5 B. & Ald.

335; *Marchant* v. *Evans*, 2 J. B. Moore, 14; *Gibbs* v. *Gas Co.*, 130 U. S. 396, 412; *Irwin* v. *Williar*, 110 U. S. 499; *McMullen* v. *Hoffman*, 174 U. S. 639; *Embry* v. *Jemison*, 131 U. S. 336, 348; *Miller* v. *Ammon*, 145 U. S. 421, 427; *Hanauer* v. *Doane*, 12 Wall. 342; *Sprott* v. *United States*, 20 Wall. 459; *Kohn* v. *Melcher*, 43 Fed. Rep. 641; *Peck* v. *Burr*, 10 N. Y. 294, 297; *Johnston* v. *Dahlgren*, 166 N. Y. 355, 358; *Brinkman* v. *Eisler*, 40 N. Y. St. 865, 866.

These cases show that wherever and in whatever form the question has arisen, whether for goods sold and delivered, for money loaned, services rendered, there can be no recovery on an implied contract where the express contract is illegal and the goods sold, the money loaned, or the services performed under and in pursuance of and in furtherance of an illegal contract.

Mr. Justice Harlan made the following statement of facts.

The Continental Wall Paper Company, a corporation of New York brought this action against The Lewis Voight & Sons Company, a corporation of Ohio, to recover the sum of $56,762.10, as the alleged balance on an account for merchandise sold and delivered to the defendant.

The petition and answer were both amended. The amended answer contained six separate defenses, the last three of which were made counterclaims and cross-petitions. The plaintiff demurred to the second, third, fourth and fifth defenses upon the ground that neither of them stated facts sufficient to constitute a defense; and it demurred to the first and second counterclaims and cross-petitions upon the ground that they did not state facts sufficient to constitute a cause of action against the plaintiff. It also replied to the sixth defense and to the third counterclaim.

The cause was submitted in the Circuit Court on the demurrers, and the court sustained the demurrer to the second, fourth and fifth defenses and to the first and second counter-

claims and cross-petitions, but overruled the demurrer to the third defense. The parties not desiring to plead further, it was adjudged that upon the allegations of the third defense the defendant was entitled to judgment (and judgment was entered) dismissing the petition and amended petition; and was likewise entitled to judgment (and judgment was entered) dismissing the first and second counterclaims and cross-petitions. The case was carried by the Continental Wall Paper Company to the Circuit Court of Appeals, where it was assigned for error that the Circuit Court erred in overruling the demurrer to the third defense, and in dismissing the suit. The Circuit Court of Appeals affirmed the judgment, thereby sustaining the sufficiency of that defense. The case is fully reported in 148 Fed. Rep. 939.

If the facts stated in the third defense—taking them to be true, as upon demurrer we must do—are sufficient to prevent any recovery whatever, by the plaintiff, it is not necessary to go further and consider any other questions. In view of the peculiar character of the case it is deemed just to the parties, however much it may lengthen or burden this opinion to do so, to set out that defense fully and in the words of the answer.

The third defense—the facts stated therein being admitted by the demurrer—gives the names of numerous companies and firms (more than thirty in number) which formed a combination by the name of the Continental Wall Paper Company, and also sets out the various agreements under which, it was, alleged, the combination was organized to restrain and monopolize interstate commerce. The defendant corporation alleged that on the first day of July, 1898, the National Wall Paper Company was the owner of factories for the manufacture of wall paper in certain cities in New York, Pennsylvania, New Jersey and Massachusetts, and that there were like factories owned by persons and corporations in other States; that "all of said companies and firms were engaged in the manufacture of wall paper and in selling their product in the States where their said manufactories were situated, and in all the

other States and Territories of the United States and in foreign countries, and were each and all engaged in commerce between the States and Territories and with foreign nations, and they produced and sold upwards of ninety-eight (98) per cent of all the wall paper manufactured and sold in the several States and Territories of the United States. Contriving and intending and conspiring with each other to form a combination and trust by which to limit the production of wall paper in the United States and also to enhance the price thereof to the jobbers, the wholesalers, the retailers and the consumers of wall paper, which is an article of commodity of general necessity and use among the United States and foreign countries, and, as such, was and is used and sold everywhere for the preservation, protection and decoration of buildings and dwelling houses; and, contriving and intending and conspiring with each other to unlawfully control and restrain trade and commerce between the several States and Territories of the United States, and with foreign countries, the firms and corporations hereinbefore mentioned, agreed with each other that while said corporations and persons retain the ownership of their several plants and business, and preserve and continue their separate identities and operate said several manufactories and business as before, the control of said several businesses, and all matters relating to and affecting the production of said establishments and the prices and sale of wall paper manufactured thereby, should be placed under the control of a committee to be appointed by said several corporations and firms, each to have a voice in such appointment, in proportion to the capacity of the several factories owned by them respectively; that said committee should adopt rules and regulations governing the manner of conducting the business of all said persons, firms and corporations, the hours said factories, owned by them, should be operated, the patterns of wall paper to be manufactured by them, the times when samples of the goods to be manufactured for the ensuing season should be submitted to a pricing committee, appointed by said committee, to enable it to classify and

fix the list prices thereof; to fix and determine list prices, dis-
counts, terms of sale, equalization of freight rates and all other
matters affecting the production and regulation of prices, and
the classification of the dealers in wall paper in the United
States; and the prices at which wall paper should be sold to,
and by such several classes; and the division of the profits,
thence arising among said corporations and firms, not in pro-
portion to their production and sales, but in proportion to their
capacity; and, further, that, to secure the faithful performance
by each of said persons and corporations of the provisions of
said trust agreement, they should each pay a sum into a com-
mon pool, in proportion to the capacity of their respective manu-
factories, which said sum should be forfeited by any of said
manufacturers who should break said agreement, compete with
the other parties to said agreement, or sell at other or different
prices than those to be fixed by said committee.   .  .  ."

*     *     *     *     *     *     *     *

"The National Wall Paper Company, for itself and the mem-
bers of said combination, hereinbefore alleged to be repre-
sented by it, should select three (3) so-called directors of said
The Continental Wall Paper Company, and said other firms
and corporations should select three (3) other so-called direct-
ors of said company, which six (6) so-called directors should
select a seventh (7th), who should decide all disputed matters;
that said corporation and firms, calling itself, or themselves,
respectively, the vendor, should sign a printed contract or
agreement with said The Continental Wall Paper Company,
calling itself the company, a copy of which contract or agree-
ment is attached hereto marked 'Exhibit 1,' [which is given in
the margin [1]] the said agreement being printed with blanks for

---

[1] EXHIBIT 1.

An agreement, made this — day of ——— in the year one thousand
eight hundred and ninety-eight, by and between ——— ——— a corpo-
ration organized under the laws of the State of ——— (hereinafter called
the vendor), party of the first part, and the Continental Wall Paper

the necessary signatures as well as numbers of shares allotted, the sum to be paid therefor and the name of the so-called vendor.

---

Company, organized under the laws of the State of New York (hereinafter called the company), party of the second part.

Whereas, the vendor is engaged in the manufacture and sale of wall paper, borders and other articles usually produced and handled in connection therewith, and the company is desirous of acting as its selling agent in handling the entire product of the vendor; and

Whereas, the company has an authorized capital of two hundred thousand dollars, divided into 16,000 shares, of the par value of $12.50 each; and

Whereas, the vendor is desirous of acquiring shares of the stock of said company at par, and to that end has offered to enter into this agreement and to secure the performance thereof by the deposit of said shares.

Now, therefore, in consideration of the foregoing recitals, and for other good and valuable considerations it is agreed, between the parties hereto, as follows:

First. The vendor hereby agrees to sell unto the company and the latter agrees to purchase, the entire product of wall paper that may be manufactured by the vendor for the period from July 20th, 1898, to the first day of July, 1899.

The prices at which the merchandise shall be sold to the company are set forth in a schedule hereto annexed, marked "A" and hereby made part of this agreement.

The vendor further grants unto the company the right to two renewals of said contract of one year each, provided that in the event of the election of the company to avail itself of either of said renewals it shall so signify in writing to the vendor before the first day of June next preceding the renewal term, and provided further that such election to renew shall be accompanied by the written consents of all the registered stockholders of the company, including that of the vendor.

Second. That the goods acquired by the company from the vendor hereunder which are to be sold to jobbers, shall be so sold by the company, and not by the vendor, for the account of the company. Such sale shall be made by the company at discounts from road prices fixed in the schedule hereto annexed, marked "B," which is hereby made part of this agreement. The vendor will deliver such goods upon the direction of the company, at the risk and for the account of the latter f. o. b. at the place of manufacture, provided, however, that in all cases in which the goods are manufactured at places other than the cities of New York

"For the purposes and with the intentions aforesaid, it was further agreed that said The Continental Wall Paper Company should, in some form so as to disguise the real nature of the transaction, compel all dealers in wall paper, whether

or Philadelphia the vendor will equalize the freights with either of said cities out of the proceeds receivable for such goods. Memorandum invoices shall be supplied to the customers and to the company immediately upon the shipment and delivery of such goods, said invoices specifying quantities and road prices.

Third. There shall be furnished by the vendor to the company, on the 7th, 14th, 21st and last days of each month (except when those days fall on Sundays, and then on the next preceding day), a just and true statement of all shipments and deliveries of merchandise included in this contract which the vendor may make for the account of the company, which statement shall contain the names of the purchasers, the character of the goods sold and the prices at which they are sold, to the end that the company may make the proper charges, and in order to entitle the vendor to be credited with the agreed cost price for such goods.

Each of such statements of shipment shall be accompanied by an affidavit of one of the officers of the vendor and one of its bookkeepers and of one of its shipping clerks, to the effect that the information contained therein is true.

Fourth. The vendor will, at the option of the company, sell for the latter such of the goods manufactured by the vendor as are to be disposed of to purchasers not classified as jobbers, which sales shall be made at the cost and expense of the vendor, said vendor hereby guaranteeing all credits connected with such sales. The prices at which and the terms upon which such goods are to be sold are designated in this agreement as the "road prices," and are contained in a schedule hereto annexed, marked "C," which is hereby made a part of this agreement.

On the 7th, 14th, 21st and last days of each month (except when those days fall on Sundays, and then on the next succeeding days) the vendor will furnish to the company a statement showing all the shipments made on account of such sales, which statement shall contain the names of the purchasers, the character of the goods and the prices at which they were sold, and such sales shall be credited to the vendor by the company at the prices fixed in schedule "A," and shall be charged against said vendor at the prices at which they were sold, which shall in no event be less than those designated in schedule "C."

The vendor is to receive for its services and expenses connected with

jobbers or wholesalers, to sign an agreement obligating the jobbers or wholesalers to buy from no one but said members of said combination and trust, and at the prices fixed in schedule B, attached to said 'Exhibit 1,' and likewise an agreement

---

such sales and allowances discounts equal to those who are designated in a classification made by the parties hereto as "second class jobbers," less the discounts made on sales to purchasers designated in the accompanying schedules as "quantity purchasers" on which the vendor has allowed the quantity discount, except that where special and exclusive goods are sold there shall be an allowance of 30 per cent discount to the vendor.

The prices of goods as fixed by schedules "A" and "C" may be altered from time to time, but the discounts allowed to jobbers shall not be altered at any time during the term of this agreement.

Fifth. The vendor will make collections of all accounts for goods sold by it for the accounts of the company under the provisions of the agreement, except for sales to jobbers (which accounts the company is to collect), and will, on the 10th of each and every month during the term of this agreement, account to the company. Such accounts shall be accompanied by a payment by the vendor to the company of the difference between the prices at which the goods are agreed to be sold to the company as embodied in schedule "A," and the prices at which the vendor has agreed to dispose of said goods as contained in schedule "C."

The purchases made by the company from the vendor hereunder shall be upon the same credit and terms as those accorded to other dealers, but the company shall have the right to anticipate the due date of all such purchases, and will pay, on the 10th day of each month, to the vendor a sum on account of all shipments of the preceding month equal to not less than 30 per cent of the road prices of goods shipped to the jobbers by the company.

Sixth. The vendor hereby grants unto the company the right, and it shall be the duty of the latter, through its officers selected for that purpose, to audit the books of accounts of the vendor at such time and in such manner as the company may, from time to time, deem necessary or proper. This provision is of the essence of the agreement, and a failure on the part of the vendor to faithfully perform the same shall operate as a breach of the contract entitling the company to abrogate the agreement and to such damages as it may be able to establish in addition to the absolute transfer and surrender to it of the stock to be pledged as hereinafter provided.

Seventh. There shall be a committee selected from the company to

by such jobbers, not to sell goods to dealers other than jobbers, at lower prices or upon better or more favorable terms than those shown in schedule C, attached to said 'Exhibit 1,' under the penalty that, if they refused so to do, no wall paper should

be known as an auditing committee, which shall be made up from among the directors. Said committee shall have power to establish such a system of bookkeeping as in its judgment may be advisable.

In order to conform as nearly as may be to the laws of the various States in which the factories of the vendor are located, it is understood that the vendor shall not be at liberty to require from the company the acceptance of the product of more than ten hours per day of any one of said factories.

The product intended to be sold to the company hereunder and which the latter undertakes to acquire, does not contemplate the enlargement of the manufacturing facilities of the vendor, but nothing herein contained shall be construed as affecting the right of the vendor to substitute new machinery of the same capacity for any now in use which may become useless through wear or through destruction by fire or other casualty.

The power to designate the parties who are to be classed as jobbers and the discounts to which they are entitled is expressly reserved by the company, and such designation is to be made through its board of directors, but the vendor shall have the right to select the jobbers through whom the goods manufactured by it are to be distributed.

All orders placed with the vendor by jobbers on behalf of the company must at once be reported to the latter.

Eighth. The company hereby agrees to sell and the vendor agrees to purchase ——— shares of the common stock of the company, for which stock the vendor agrees to pay the sum of ——— in cash as soon after the execution and delivery of this agreement as the same may be demanded by the company, but only if and when the entire share capital of the company shall have been fully subscribed at not less than par.

The vendor will, after paying for said shares of stock, endorse the certificates representing the same, and deliver the certificates so endorsed in blank unto the company, upon the trust and agreement that the company shall hold said certificates as security for the performance by the vendor of each and all of the covenants and conditions of this agreement and that upon the refusal, neglect or omission of the vendor, its successors or assigns, to perform this agreement, or any part thereof, the said shares of stock and certificates represented thereby shall be immediately sold by the company at public or private sale, without

be sold to such jobber by any of said corporations or firms, and that, thereby, such jobbers should be driven out of business; and that, in some form or other, so as to disguise the real nature of the transaction, all wholesalers other than jobbers should be compelled to make an agreement in writing, with said corporations or firms, not to sell such goods on terms better or more favorable than those specified in schedule C, attached to said 'Exhibit 1,' under penalty that if such wholesaler refuse to sign and carry out said agreement, no wall paper would be sold to him by any of said corporations or firms, and he should be driven out of business, and that the profits made by such prevention of competition and enhancement of price should be divided among said corporations and firms nominally as dividends upon said stock, but in reality, in proportion to their respective holdings as aforesaid, and that said committee of said corporation and said firms, calling themselves such directors, should regulate all the matters hereinbefore averred, prevent competition between said corporations and firms, limit production and enhance prices, and close all channels by which the consumer or retailer could obtain wall paper from the producers thereof.

"In pursuance of said agreement, said plaintiff was nominally incorporated with the stock aforesaid, divided into the

---

notice, upon such terms and at such price as the company or its officers may deem reasonable, and that the proceeds of the sale be paid into the treasury of the company as agreed and liquidated damages to the company for the breach of said agreement.

The parties hereto have fixed upon the said stock, and the proceeds thereof, as liquidated damages, because of the difficulty in establishing, in a court of law, the actual damage that would be suffered by the company in the event of the refusal, neglect or omission to perform this agreement, and in order to avoid the difficulty of such proof.

In witness whereof, the vendor and the company have respectively caused this agreement to be executed by their respective presidents and their respective corporate seals to be hereto attached pursuant to resolutions of their respective boards of directors, the day and year first above written.

number of shares aforesaid, of the par value aforesaid, which were divided among the parties to said agreement aforesaid, in the manner aforesaid, and said contracts signed by said The National Wall Paper Company, and said persons and corporations, being, at once, subscription for stock by said so-called vendors, the acceptance of such subscription by said The Continental Wall Paper Company, and by it, nominally, each so-called vendor sold unto the company, and the latter agreed to purchase, the entire product of wall paper manufactured by each of said vendors for the period from July 20th, A. D. 1898, to the first day of July, A. D. 1899.

"Said contract further fixed prices at which the merchandise should be nominally sold to the company, said prices being the cost of production with a slight profit added thereto, sufficient to cover incidental expenses merely. The prices at which said goods were to be nominally sold by said so-called vendors to said company are set forth in the schedule attached to said 'Exhibit 1' and marked 'A.'

"Said agreement further nominally provided that the goods pretended to be acquired by the company, from the so-called vendor, which were to be sold by jobbers, should be so sold by the company and not by the vendor, for the account of the company, but that the goods acquired by the company from the so-called vendor, which should be sold to wholesalers other than jobbers, should be sold by the so-called vendor for the account of the company.

"The schedule attached to said agreement contained a list of prices for all commodities in the wall paper line, which were called 'List' or 'Road Price,' and said contract provided that sales made to jobbers should be made at discounts from said 'List' or 'Road Prices' fixed in the schedule marked 'B,' annexed to said 'Exhibit 1;' but that, in all cases in which the goods were manufactured at places other than the cities of New York or Philadelphia, and sold to jobbers, the vendor should equalize the freights with either of the said cities, out of the proceeds receivable for such goods.

"In reality, the agreement was, and so the business was carried on, that the manufacturers should· maintain sample rooms and selling agents, and should solicit and receive the orders from all wholesalers, whether jobbers or so-called 'Road' or 'Quantity Buyers;' that the entire business should be done by said so-called vendors, but payments should be made by the jobbers to the so-called company, and by the wholesalers, other than jobbers, directly to the so-called vendors.

"Said contract further provided, in order to protect said corporations and firms against competition from each other, and to insure against violation of said agreement, or any of them, that, from time to time, invoices should be supplied, at once to the customer and to the company, upon shipment and delivery of such goods, specifying quantities and road prices; that each vendor should furnish to the company, at periods stated, just, true, and sworn statements of all shipments and deliveries of merchandise made by the vendors direct to the purchasers, which statements should contain the names of the purchasers, the character of the goods sold, and· the prices at which they were sold, so that the company might receive the difference between the prices at which the goods were nominally billed to said company, and at which they were sold to the purchaser, to the end that this difference, being the net profits derived from such purchase and sale, should be divided among such corporations and firms, in proportion to the capacity of their respective businesses, determined as aforesaid, without regard to the amount sold by each.

"The prices at which, and the terms upon which, goods were to be sold by the vendors to all wholesalers other than jobbers, were designated 'Road' or 'List' prices, and were contained in the schedule marked 'C,' annexed to said 'Exhibit 1,' and forming a part thereof.

"For the further purpose of carrying out said agreement, and ascertaining said net profits, and for further disguising the real nature of the transaction, it was provided that the so-called vendor should receive from sales made by it to so-called

'Quantity Buyers,' the difference between the discounts allowed to those designated in the classification hereinbefore referred to as 'Second Class Jobbers' and the discounts provided in said agreement to be made to purchasers styled, in said schedules, 'Quantity Buyers' in which the vendor is allowed the quantity discount, except that, where special and exclusive goods were sold, there should be an allowance of thirty (30 per cent) per cent discount to said vendor.

"Said agreement further stipulated that the prices of goods as fixed by said schedules A and C might be altered from time to time, but the discounts allowed to jobbers should not be altered at any time during the term of the agreement.

"Said written contract further provided that the so-called vendor should make collections of accounts for goods sold to wholesalers other than the jobbers, but that the company should collect the proceeds of sales to the jobbers, and that accounts should be stated between the so-called vendors and the company at stated periods, and the account accompanied by payment, by the so-called vendor, to the so-called company, of the difference between the prices at which the goods were to be billed to the company and the prices at which the so-called vendors had agreed to charge the 'Quantity-Buyers.'

"It was further stipulated in said agreement that monthly divisions should be made by said company of at least thirty (30) per cent of the 'Road Prices' of goods shipped to jobbers by the company.

"For the further purpose of protecting said corporations and firms and individuals from each other, preventing and stifling competition, and enforcing said combination, trust and monopoly, each of said corporations and vendors gave the company the right, and made it the duty of the company, to audit the books of account of said so-called vendors, at such times and in such manner as the company might from time to time deem necessary or proper. It was further stipulated that this right to examine and audit the books was of the essence of the agreement, and that a failure on the part of the so-called ven-

dor, to permit the same, should operate as a breach of the contract, entitling the company to abrogate the agreement, to recover such damages as it might be able to establish, and to the forfeiture of the stock held by said vendor in such company.

"It was further provided that said so-called company should appoint an auditing committee from its directors, which should establish such a system of bookkeeping as it thought advisable.

\*   \*   \*   \*   \*   \*   \*   \*

"It was further a part of said agreements, though not reduced to writing, save as it set forth in said exhibit, that all jobbers and other wholesalers of wall paper should be forced to sign an agreement, binding themselves to purchase their entire stock of wall paper, nominally either from plaintiff or from said corporations or firms, at prices fixed in said 'Exhibit 1,' and that they should only sell at prices fixed in the schedules attached to said 'Exhibit 1,' under the penalty, which the combination of all of said corporations and firms enabled them to enforce, that such jobbers or wholesalers, in case of refusal to accede to the terms so imposed, or in case of violation thereof, should be unable to buy wall paper; should be driven out of business, and should sacrifice the good-will and capital therein invested.

\*   \*   \*   \*   \*   \*   \*   \*

"In the further carrying out of said purpose, said plaintiff and other persons, natural or artificial, engaged in the manufacture and sale of wall paper in different States of the Union, and in trade and commerce between the several States and foreign countries, whose names and locations these defendants are unable to state, entered into contracts substantially similar to 'Exhibit 1,' except that, instead of such persons pledging stock in plaintiff as security for the performance, by them, of the stipulations of said contract, they gave other security, the nature of which these defendants are unable to state, and which such other persons assume obligations, and gave, to said plaintiff, rights and powers, and said plaintiff exercised, as to them, such rights and powers, as were created by said instru-

ment 'Exhibit 1,' and were exercised by plaintiff and its offi-
cers and directors in relation to the persons, natural or arti-
ficial, who were theretofore members of such combination and
trust.

"In the further carrying out of said scheme to stifle compe-
tition; to restrain commerce between the States and Territories
of the United States and with foreign countries; to unduly and
unreasonably enhance prices, it was further agreed between
the members of said combination and trust, that the so-called
directors of plaintiff, being really a committee appointed, as
aforesaid, by said the members of said trust or combination,
should arbitrarily classify the wholesale dealers of wall paper in
the United States and Territories thereof, into two (2) classes,
namely, jobbers and 'Road' or 'Quantity Buyers;' that they
should further arbitrarily classify the jobbers into 'first class,'
and 'second class' and 'third class' jobbers; that they should
further arbitrarily classify the other wholesalers into 'Road'
or 'Quantity Buyers,' and 'Special Buyers;' that, being thus
classified, they should all be compelled to sign written agree-
ments, nominally with said company, really with said mem-
bers of said combination or trust, obligating them to buy their
entire stock of merchandise from said company.

"A copy of said agreement so to be signed by said jobbers, is
attached hereto, marked 'Exhibit 2' [which is in margin [1]] and

---

[1] Exhibit 2.

An agreement made this — day of ———, in the year one thousand
eight hundred and ninety-eight, between the Continental Wall Paper
Company, a corporation organized under the laws of the State of New
York (hereinafter called the company), party of the first part, and
——— ———, of ——— (hereinafter called the jobber), party of the
second part.

In consideration of the sum of one dollar, paid by the jobber unto the
company for granting of this agreement, the receipt whereof is hereby
acknowledged, and other valuable considerations, it is agreed between
the parties hereto as follows:

First. That the company will sell, subject to such credit limitation
as it may impose, and the jobber will purchase the entire requirements

made part hereof, the same being printed forms with blanks for names, dates and amounts of purchases.

"To conceal the fact that it was an agreement to purchase from no one but said company, and the members of said combination and trust, the amount of purchases made by the buyer, in the previous year, from all the members of said combination or trust, being the entire amount of purchases made by such

---

of the jobber in his business of selling wall paper for the business year ending July 1st, 1899, to the amount of a gross value, without discounts, of ———, the jobber reserving to himself the right to purchase such merchandise as he may need in excess of ——— from others.

The company is to deliver the goods without additional charge f. o. b. at New York or Philadelphia, or to equalize freights from the places at which it makes deliveries to either of said cities.

Second. The jobber shall be allowed discounts at the rates shown in the accompanying schedule, marked "A," which is hereby embodied in this agreement as a part thereof.

The terms of payment to be as follows: Four months from the date of invoice, with discount at the rate of 1 per cent per month for anticipated payment; provided settlement be made within 30 days from date of shipment, either by cash or note. Invoices for all goods shipped between October 15th and March 1st to take the latter date.

Third. Attached hereto, marked "B," is a schedule of the road prices at which the company sells its goods for the term embraced in this contract to dealers other than jobbers, and also a statement of discounts allowed to such customers other than jobbers for quantity purchases, together with the terms of credit and freight allowance to which such customers are entitled.

It is an essential condition of this agreement that the jobber will not directly or indirectly sell or offer for sale any of the merchandise purchased from the company hereunder at lower prices or upon better or more favorable terms than those shown in schedule "B," the intent hereof being to assure the company against the use by the jobbers of this agreement to undersell the company.

The prompt performance by the jobber of the provisions of this agreement as to payment and otherwise is a condition precedent to exacting the continuous performance of said agreement by the company.

In witness whereof the company has caused this instrument to be executed, and the jobber has hereunto set his hand, the day and year first above written.

buyer, during the preceding year, was ascertained, and an amount at least double thereof, being an amount supposed to be, and which was in fact, more than, by any possibility, could be needed by such buyer, was inserted in said blank as the amount to be purchased by such buyer from the company.

"By said agreement, the prices to be paid by the jobber were fixed according to the class in which he was arbitrarily placed, at prices enumerated in schedule B, attached to said 'Exhibit 1,' and the prices at which, alone, said jobber could sell were fixed as shown by schedule C, attached to said 'Exhibit 1.'

\* \* \* \* \* \* \* \*

"Schedule A attached to said 'Exhibit 2' is the same, so far as relates to jobbers of the class with whom the agreement is made, as the corresponding provisions of schedule B, attached to said 'Exhibit 1' and schedule B, attached to 'Exhibit 2' is the same as schedule C, attached to 'Exhibit 1.' The members of said combination and trust, and said plaintiff, further to carry out said agreement, compelled all other wholesale and quantity buyers to sign agreements in the form attached to this answer, marked 'Exhibit 3' [which is in the margin[1]], and

---

[1] EXHIBIT 3.

In consideration of your having sold us wall paper, etc., at list prices and at quantity discounts as per following schedule:

|  | Per cent | | Per cent |
|---|---|---|---|
| Up to 5½c. inclusive | 600 rolls, 5 | 1200 rolls, 10 |
| 6c. to 9c. inclusive | 300 rolls, 7½ | 600 rolls, 12½ |
| 10c. to 15c. inclusive | 200 rolls, 10 | 400 rolls, 15 |
| 16c. and up | 100 rolls, 10 | 200 rolls, 15 |

Discount on borders and ceiling papers follow the discounts on the hangings they match.

Plain ingrains.

Varnish tiles, 200 rolls or more, 10 per cent.

Ingrain borders, 26 rolls of a kind, 10 per cent

Ingrain borders, 50 rolls or over, 15 per cent.

We hereby agree not to sell any of such goods to others on terms bet-

filed herewith; the same being a printed form with blanks for signatures and having attached thereto the prices shown in schedule C, attached to 'Exhibit 1,' which are the list prices referred to in said agreement.

"All said agreements, 'Exhibits 1, 2 and 3' were drawn for the purpose, and with the intent of disguising the real nature of the transaction and the real purpose, as herein set forth.

"In further carrying out said combination and with said purpose and intent, agreements were made by plaintiff and the members of said combination and trust, and persons, natural and artificial, in the Dominion of Canada, by which each agreed not to compete with the other, nor cut prices, the Americans in Canada, the Canadians in the United States.

"On, before and after said first day of July, A. D. 1898, this defendant had a large and profitable business of long standing, possessing a valuable good will, and in which it had a large capital invested, being what is generally called the business of a jobber or wholesaler of wall paper in the State of Ohio and throughout the States and Territories of the United States.

"The defendant and all other persons engaged in the wholesale wall paper business, at the beginning of each season, which commenced in September and closed the first of July, following, according to the custom of the trade, bought from the various persons engaged in the manufacture and sale of wall paper in the *United States, being the persons, members of said combination and monopoly, their* stock of wall paper to be sold by them during the ensuing year, such stock to be manufactured for them from samples submitted at the beginning of said season, in wholesale lots, and those for defendant to be shipped to Cincinnati, Ohio, and there resold by defendant, from time to time, to retail dealers throughout the States of Ohio, Kentucky,

ter or more favorable than those specified in the above schedule nor lower than said list prices, and our faithful performance of this agreement is a condition precedent to the filling of our order.

The intent hereof is to protect you fully against being undersold by us among customers to whom you do [not] allow quantity discounts.

Indiana, Illinois, and other States and Territories of the United States.

"At said time said members of said combination and trust having, by the agreements and acts aforesaid, obtained the control of the wall paper trade throughout the United States, at once greatly advanced the price of said wall paper, and threatened defendant that, unless it signed said agreement, 'Exhibit 2,' no wall paper would be sold to it; that said combination would make it impossible for it to buy wall paper, or to continue its business, and would drive it out of its said business, and compel it to sacrifice the good will owned by it as aforesaid, and the capital invested by it in said business.

"Said combination or trust then, and from that time thereafter, until the first day of July, A. D. 1900, had the power, by means of said combination and said agreements, and the will, to carry out its said threats, and deprive these defendants or any person, firm or corporation engaged in the business of selling wall paper in the United States, of the power to obtain wall paper for its or their trade, and the will and the power to drive out of business any person, firm or corporation engaged in the business of selling wall paper; deprive them of their good will, and compel them to sacrifice the capital invested in the business.

"In like manner, by the same means, all other jobbers and wholesalers of wall paper in the United States, and all persons engaged in commerce in the wall paper trade between the several States of the Union and foreign countries, were compelled to, and did sign the agreements attached to this answer, as 'Exhibits 2 and 3.'

"The immediate, intended and direct effect of the said combination and agreements was the stifling of competition between said manufacturers and vendors of wall paper, and between the jobbers and wholesalers thereof, and to unduly enhance the price of wall paper, making it one-half more than the price which it would be had the same been left to free and unrestrained competition; to compel said jobbers and whole-

salers to pay such unduly enhanced and unreasonable price to plaintiff, and to members of said combination, and to exact from others an unduly enhanced price.

"After the making of said agreements, as before, the members of such combination solicited and received orders from this defendant, and all other wholesalers; filled their orders; charged the prices fixed in said schedules attached to said 'Exhibit 1' and directed that payment for such merchandise should be made by the jobbers to said plaintiff combination for said several members of said combination and trust, to be divided in the manner aforesaid. Said combination contrived, intended and did prevent free and unrestrained competition between the producers, and between the purchasers of wall paper, and between the jobbers and wholesalers of wall paper throughout the United States.

"Defendant avers that said plaintiff, and the members of said combination as aforesaid, being more than two persons, firms, corporations, partnerships, and associations, combined capital and skill for each and all of the following purposes, to wit: To create restrictions in trade and commerce; to carry out restrictions in trade and commerce; to limit the product of wall paper; to reduce the production of wall paper; to increase the price of wall paper; to prevent competition in the manufacturing and making of wall paper; to prevent competition in the sale of wall paper; to prevent competition in the purchase of wall paper; to fix a standard or figure whereby its price to the public or consumer should be controlled and established as to an article or commodity of merchandise, to wit: wall paper intended for sale, use and consumption in the States of Ohio, Indiana, Kentucky and Illinois; to make and enter into contracts, obligations and agreements by which they bound themselves not to sell or dispose of wall paper below a common standard figure or fixed value; to carry out contracts, obligations and agreements by which they bound themselves not to sell or dispose of wall paper below a common standard figure or fixed value; to make and enter into contracts, obligations

and agreements by which they agreed to keep the price of wall paper at a fixed or graduated figure; to carry out contracts, obligations and agreements by which they agreed to keep the price of wall paper at a fixed or graduated figure; to make and enter into contracts, obligations and agreements by which they established and settled the price of wall paper between themselves and between themselves and others, so as to both directly and indirectly preclude a free and unrestricted competition among themselves, and among themselves and purchasers, and among purchasers in the sale of wall paper; to carry out contracts, obligations and agreements by which they established and settled the price of wall paper between themselves and themselves and others, so as to both directly and indirectly preclude a free and unrestricted competition both between themselves, and between themselves and purchasers, and between purchasers in the sale of wall paper; to make and enter into contracts, obligations and agreements by which they agreed to pool, combine, and both directly and indirectly unite the interests they had connected with the sale of wall paper so that its price might be affected; to carry out contracts, obligations and agreements by which they agreed to pool, combine and both directly and indirectly unite the interests that they had connected with the sale of wall paper so that its price might be affected.

"Said contracts and agreements were each and all combinations and conspiracies in restraint of trade and commerce among the several States, and with foreign nations, and had the intent and effect of restraining trade and commerce between the several States and with foreign nations, and were an attempt, by combinations and conspiracy, between the members of said combination and trust to monopolize the trade and commerce in wall paper among the several States and with foreign nations, and, by said contracts, and the acts done by members thereof, and by said plaintiff under and in pursuance thereof said plaintiff and the said members of said combination or trust did monopolize and attempt to monopolize the trade and

commerce in wall paper among the several States and with foreign nations.

"In further carrying out of said scheme and combination the members thereof delivered to this defendant, in the year from September, A. D. 1898, to September, A. D. 1899, wall paper for which this defendant paid to said plaintiff, for and per direction of the members of said combination, the sum of one hundred and forty-four thousand eight hundred and fifty-four dollars and fourteen cents ($144,854.14).

"These defendants aver that the prices charged in said Exhibit attached to said amended petition [which are itemized accounts showing each article and the price therefor alleged to have been sold and delivered to the defendant] *are the prices fixed and determined in pursuance of and by the combination or trust agreement, as above set forth, and are unreasonable, unjust and excessive* and *at least one-half more than they would otherwise have been. In transacting all business aforesaid, at all said times, said business was transacted under and in pursuance of said combination or trust agreement, and for the purposes, and each of them, above specified, and not otherwise.*

"The allegations in said plaintiff's petition set forth as a suit on account are an attempt to enforce, carry out and recover upon and by virtue of said unlawful combination, aforesaid, *the prices fixed by such combination, and the prices therein sought to be recovered for said merchandise are unreasonable, excessive and above the fair market price of such merchandise by more than the amount so sought to be recovered.*

"Each and all of the provisions of said contract and agreement between said members of said combination and each other; between said so-called vendors and said plaintiff; between said members of said combination and said plaintiff and the so-called jobbers; between the members of said combination and trust and said plaintiff and the so-called 'Road' or 'Quantity Buyers,' are each and all contrary to the provisions of the statutes of the State of New York, where said plaintiff was organized; contrary to the provisions of the laws of the

State of Ohio, where the merchandise was delivered; contrary to the laws of the several States where each of the members of said combination did business; contrary to the laws of the United States; and made criminal by the laws of each of said several States and by the laws of the United States; and each and all of said agreements aforesaid are contrary to public policy, and in violation of the rights of the defendant, and injurious to the interests of the consumer and of the public."

··Mr. Justice Harlan, after making the above statement, delivered the opinion of the court.

The Anti-Trust Act of 1890 declares illegal every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, and also declares it to be a misdemeanor, punishable by fine or imprisonment, or both, for any one to make any such contract or to engage in any such combination or conspiracy. § 1. It is also made a misdemeanor, punishable by fine or imprisonment, or both, for any one to monopolize or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of the trade or commerce among the several States or with foreign nations. §.2. Similar provisions were made in reference to contracts, combinations in the form of trust or otherwise, or conspiracies, in restraint of trade or commerce in any Territory of the United States or in the District of Columbia, or between any such Territory or another, or between any such Territory or Territories and any State or States or the District of Columbia or with foreign nations, or between the District of Columbia and any State or States or foreign nations. § 3. The act further provided that any person injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful, may sue therefor in the Circuit Court of the United States in the district where the defendant resides or is found, without regard to the amount

in controversy, and recover threefold the damages sustained by him. § 3.   26 Stat. 209.

The defendant contends that under the facts admitted by the demurrer it must be taken that the Continental Wall Paper Company is the representative in this suit of a combination or trust formed for the purpose of restraining and monopolizing trade and commerce among the several States in the manufacturing, buying, selling and dealing in wall paper; that this combination has the direct effect to accomplish that purpose; that the defendant, engaged in buying and selling wall paper in Ohio and other States, was compelled to become a party to the illegal combination or go out of business; that the account in suit was made up, as to prices and terms of sale, not upon the basis of an independent, collateral contract for goods sold and delivered, but with direct reference to, in conformity with and for the object of enforcing the agreements that constituted, or out of which came, the illegal combination whose business is carried on under the name of the Continental Wall Paper Company; that a judgment against the defendant upon the account in suit will, in effect, legally and practically aid the combination to reap the fruits of agreements that were illegal under the acts of Congress, and the making of which was declared by that act a crime; consequently, that the petition upon the facts admitted was properly dismissed.

That the combination represented by the plaintiff company is within the prohibitions of the above act of Congress is clear from the facts admitted by the demurrer.   We assume, therefore, without discussion—for discussion is unnecessary—that there is a combination, of which the Continental Wall Paper Company is the representative, and that, in violation of that act, such combination was formed with the intent, and will have the effect, directly, to restrain as well as monopolize trade and commerce among the several States and with foreign nations as involved in the manufacture, sale and transportation of wall paper among the several States and with foreign nations.   This part of the case is forcibly presented by the Cir-

cuit Court of Appeals which, in its opinion delivered by Judge Lurton, well said: "The conspiring mills were situated in many States. The consumers [of wall paper] embraced the whole citizenship of the United States. The jobbers and wholesalers, who were to be coerced into contracts to buy their entire demands from the Continental Wall Paper Company or be driven out of business, were in every State. Before the combination each of the combining companies was engaged in both state and interstate commerce. The freedom of each, with respect to prices and terms, was restrained by the agreement and interstate commerce directly affected thereby, as well as by the enhancement of prices which resulted. A more complete monopoly in an article of universal use has probably never been brought about. It may be that the wit of man may yet devise a more complete scheme to accomplish the stifling of competition. But none of the shifts resorted to for suppressing freedom of commerce and securing undue prices, shown by the reported cases, is half so complete in its details. None of the schemes with which this may be compared is more certain in results, more widespread in its operation, and more evil in its purposes. It must fall within the definition of a 'restraint of trade,' whether we confine ourselves to the common law interpretation of that term or apply that given to the term as used in the Federal act." 148 Fed. Rep. 939, 947.

But it is contended that however illegal the combination represented by the plaintiff may be, and whatever may be the effect of a judgment against the defendant, the plaintiff company is entitled to a judgment under the principles announced in *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, 545. Let us see what that case was and whether it may not be distinguished from the one now before us.

The Union Sewer Pipe Company, a corporation of Ohio, doing business in Illinois, brought suit against Connolly, a citizen of Illinois, upon promissory notes given in Illinois on account of the purchase by the defendant from that company, under contracts made in that State, of sewer pipe known as

Akron pipe. It also brought suit against one Dee, a citizen of Illinois, upon an open account for the value of similar sewer pipe sold to him under a written contract, also made in that State. In each case the defendant disputed his liability for the value of the goods obtained from the Sewer Pipe Company upon the ground that at the time of their respective purchases that company was in a combination with certain firms, corporations and companies engaged in the manufacture of Akron pipe, which combination, it was alleged, was in illegal restraint of trade, and forbidden by the principles of the common law, as recognized and enforced both in Ohio and Illinois. The defense was also made that the Sewer Pipe Company was a combination doing business throughout the United States and between Ohio and Illinois, in the form of a trust, in restraint of trade and commerce among the several States, contrary not only to the Anti-Trust Act of Congress of July 2d, 1890, c. 647, but contrary to the Illinois Anti-Trust statute of January 1st, 1893, forbidding, under penalties, the combination of capital, skill or acts for certain specified purposes. 26 Stat. 209; Laws Ill. 1893, p. 182; Hurd's Rev. Stat. Ill., 1899, p. 618, title Criminal Code.

The defense based upon the principles of the common law was overruled in the *Connolly Case,* the court saying: "Assuming, as defendants contend, that the alleged combination was illegal if tested by the principles of the common law, still it would not follow that they could, at common law, refuse to pay for pipe bought by them under special contracts with the plaintiff. The illegality of such combination did not prevent the plaintiff corporation from selling pipe that it obtained from its constituent companies, or either of them. It could pass a title by a sale to any one desiring to buy, and the buyer could not justify a refusal to pay for what he bought and received by proving that the seller had previously, in the prosecution of its business, entered into an illegal combination with others in reference, generally, to the sale of Akron pipe." Again, after referring to several cases establishing the general

principle that a court will not lend assistance to carry out the terms of an illegal contract, and that one purchasing and receiving goods under a contract, expressed or implied, to pay for them, cannot refuse to pay simply because of the illegal character of his vendor, the court proceeded: "In the present [Connolly] case other considerations must control. This is not an action to enforce or which involves the enforcement of the alleged arrangement or combination between the plaintiff corporation and other corporations, firms and companies in relation to the sale of Akron pipe. As already suggested, the plaintiff, even if part of a combination illegal at common law, was not for that reason forbidden to sell property it acquired or held for sale. The purchases by the defendants had no necessary or direct connection with the alleged illegal combination; for the contracts between the defendants and the plaintiff could have been proven without any reference to the arrangement whereby the latter became an illegal combination. If, according to the principles of the common law, the Union Sewer Pipe Company could not have sold or passed title to any pipe it received and held for sale, because of an illegal arrangement previously made with other corporations, firms or companies, a different question would be presented. But we are aware of no decision to the effect that a sale similar to that made by the present plaintiff to the defendants respectively would, in itself, be illegal or void under the principles of the common law. The contracts between the plaintiff and the respective defendants were, in every sense, collateral to the alleged agreement between the plaintiff and the other corporations, firms or associations whereby an illegal combination was formed for the sale of sewer pipe."

Turning to the defense based on the Anti-Trust Act of Congress, the court in the *Connolly Case* said: "Much of what has just been said in reference to the first special defense based on the common law is applicable to this part of the case. If the contract between the plaintiff corporation and the other named corporations, persons, and companies, or the combination

thereby formed, was illegal under the act of Congress, then all those, whether persons, corporations or associations, directly connected therewith, became subject to the penalties prescribed by Congress. But the act does not declare illegal or void any sale made by such combination, or by its agents, of property it acquired or which came into its possession for the purpose of being sold—such property not being at the time in the course of transportation from one State to another or to a foreign country. The buyer could not refuse to comply with his contract of purchase upon the ground that the seller was an illegal combination which might be restrained or suppressed in the mode prescribed by the act of Congress; for Congress did not declare that a combination illegally formed under the act of 1890 should not, in the conduct of its business, become the owner of property which it might sell to whomsoever wished to buy it. So that there is no necessary legal connection here between the sale of pipe to the defendants by the plaintiff corporation and the alleged arrangement made by it with other corporations, companies and firms. The contracts under which the pipe in question was sold were, as already said, collateral to the arrangement for the combination referred to, and this is not an action to enforce the terms of such arrangement. That combination may have been illegal, and yet the sale to the defendants was valid." Further: "Nor can the defendants refuse to pay for what they bought upon the ground that the seventh section of the Sherman act gives the right to any person 'injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful' by the act, to sue and recover treble the damage sustained by him. We shall not now attempt to declare the full scope and meaning of that section of the act of Congress. It is sufficient to say that the action which it authorizes must be a direct one, and the damages claimed cannot be set off in these actions based upon special contracts for the sale of pipe that have no direct connection with the alleged arrangement or combination between the plaintiff and

other corporations, firms or companies. Such damages cannot
be said, as matter of law, to have directly grown out of that
arrangement or combination, and are, besides, unliquidated.
Besides, it is well settled in Illinois that 'unliquidated damages
arising out of covenants, contracts or torts disconnected with
plaintiff's claim cannot be set off under the statute.' "

We need not here refer to that part of the *Connolly Case* re-
lating to the defense based on the Anti-Trust Act of Illinois;
for, the court adjudged that act to be void because of a certain
provision in it which, contrary to the Constitution of the Uni-
ted States, denied the equal protection of the laws to all per-
sons within the jurisdiction of the State, except a named
favored class.

The present case is plainly distinguishable from the *Connolly
Case.* In that case the defendant, who sought to avoid pay-
ment for the goods purchased by him under contract, had no
connection with the general business or operations of the al-
leged illegal corporation that sold the goods. He had nothing
whatever to do with the formation of that corporation, and
could not participate in the profits of its business. *His* con-
tract was to take certain goods at an agreed price, nothing
more, and was not in itself illegal, *nor part of nor in execution
of any general plan or scheme that the law condemned.* The con-
tract of purchase was wholly collateral to and independent of
the agreement under which the combination had been pre-
viously formed by others in Ohio. It was the case simply of a
corporation that dealt with an entire stranger to its manage-
ment and operations and sold goods that it owned to one who
wished to buy them. In short, the defense in the *Connolly Case*
was that the plaintiff corporation, although owning the pipe
in question and having authority to sell and pass title to the
property, was precluded by reason *alone* of its illegal charac-
ter from having a judgment against the purchaser. We held
that that defense could not be sustained either upon the prin-
ciples of the common law or under the Anti-Trust Act of Con-
gress.

The case now before us is an entirely different one. The Continental Wall Paper Company seeks, in legal effect, the aid of the court to enforce a contract for the sale and purchase of goods which, *it is admitted by the demurrer was in fact and was intended by the parties to be based upon agreements that were and are essential parts of an illegal scheme.* We state the matter in this way, because the plaintiff by its demurrer admits for the purposes of this case the truth of all the facts alleged in the third defense. It is admitted by the demurrer to that defense that the account sued on has been made up *in execution of the agreements* that constituted or out of which came the illegal combination formed for the purpose and with effect of both restraining and monopolizing trade and commerce among the several States.

The present suit is not based upon an implied contract of the defendant company to pay a reasonable price for goods that it purchased, but upon agreements, to which both the plaintiff and the defendant were parties, and *pursuant to which* the accounts sued on were made out, and which had for their object, and which it is admitted had directly the effect, to accomplish the illegal ends for which the Continental Wall Paper Company was organized. If judgment be given for the plaintiff the result, beyond all question, will be to give the aid of the court in making effective the illegal agreements that constituted the forbidden combination. These considerations make it evident that the present case is different from the *Connolly Case.* In that case the court regarded the record as presenting the question whether a voluntary purchaser of goods at stipulated prices, under a collateral, independent contract, can escape an obligation to pay for them upon the ground *merely* that the seller, which owned the goods was an illegal combination or trust. We held that he could not, and nothing more touching that question was decided or intended to be decided in the *Connolly Case.* The question here is whether the plaintiff company can have judgment upon an account which, it is admitted by demurrer, was made up, within the knowledge of

both seller and buyer, with direct reference to and in execution of certain agreements under which an illegal combination, represented by the seller, was organized. Stated shortly, the present case is this: The plaintiff comes into court admitting that it is an illegal combination whose operations restrain and monopolize commerce and trade among the States and asks a judgment that will give effect, as far as it goes, to agreements that constituted that combination, and by means of which the combination proposes to accomplish forbidden ends. We hold that such a judgment cannot be granted without departing from the statutory rule, long established in the jurisprudence of both this country and England, that a court will not lend its aid, in anyway, to a party seeking to realize the fruits of an agreement that appears to be tainted with illegality, although the result of applying that rule may sometimes be to shield one who has got something for which as between man and man he ought, perhaps, to pay, but for which he is unwilling to pay.

In such cases the aid of the court is denied, not for the benefit of the defendant, but because public policy demands that it should be denied without regard to the interests of individual parties. It is of no consequence that the present defendant company had knowledge of the alleged illegal combination and its plans or was directly or indirectly a party thereto. Its interest must be put out of view altogether when it is sought to have the assistance of the court in accomplishing ends forbidden by the law.

In *Hanauer* v. *Doane*, 12 Wall. 342, 349, this court said: "The whole doctrine of avoiding contracts for illegality and immorality is founded on public policy. It is certainly contrary to public policy to give the aid of the courts to a vendor who knew that his goods were purchased, or to a lender who knew that his money was borrowed, for the purpose of being employed in the commission of a criminal act, injurious to society or to any of its members."

In *McMullen* v. *Hoffman*, 174 U. S. 639, 654, 669, where

the authorities are reviewed and the whole subject carefully examined, the court said: "The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract"—citing many English and American cases —"The court refuses to enforce such a contract, and it permits defendant to set up its illegality, not out of any regard for the defendant who sets it up, but only on account of the public interest. It has been often stated in similar cases that the defense is a very dishonest one, and it lies ill in the mouth of the defendant to allege it, and it is only allowed for public considerations and in order the better to secure the public against dishonest transactions. To refuse to grant either party to an illegal contract judicial aid for the enforcement of his alleged rights under it tends strongly towards reducing the number of such transactions to a minimum. The more plainly parties understand that when they enter into contracts of this nature they place themselves outside the protection of the law; so far as that protection consists in aiding them to enforce such contracts, the less inclined will they be to enter into them. In that way the public secures the benefit of a rigid adherence to the law." In that case the principle announced in *Coppell* v. *Hall*, 7 Wall. 542, 558, was reaffirmed, namely: "Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection would be tainted with the vice of the original contract, and void for the same reason. Wherever the contamination reaches it destroys. The principle to be extracted from all the cases is, that the law will not lend its support to a claim founded upon its violation."

In *Embrey* v. *Jemison*, 131 U. S. 336, 348, the defendant, who was sued upon promissory notes given in execution of a previous verbal contract that was illegal, this court said that he could not "be permitted to withdraw attention from this

feature of the transaction by the device of obtaining notes for the amount claimed under the illegal agreement; for they are not founded on any new or independent consideration, but are only written promises to pay that which the obligor had verbally agreed to pay. They do not, in any just sense, constitute a distinct or collateral contract based upon a valid consideration. Nor do they represent anything of value in the hands of the defendant which, in good conscience, belongs to the plaintiff or to his firm. Although the burden of proof is on the obligor to show the real consideration, the execution of the notes could not obliterate the substantive fact that they grew immediately out of and are directly connected with a wagering contract. They must, therefore, be regarded as tainted with the illegality of that contract, the benefits of which the plaintiff seeks to obtain by this suit. That the defendant executed the notes with full knowledge of all the facts is of no moment. The defense he makes is not allowed for his sake, but to maintain the policy of the law. *Coppell* v. *Wall*, 7 Wall. 542, 558."

In *Montague & Co.* v. *Lowry*, 193 U. S. 38, 45, 46, which involved, in part, the question whether a particular contract made in California for the purchase of tiles related to interstate commerce, and was illegal, the court said: "The provision as to this sale is but a part of the agreement, and it is so united with the rest as to be incapable of separation without at the same time altering the general purpose of the agreement. The whole agreement is to be construed as one piece, in which the manufacturers are parties as well as the San Francisco dealers; and the refusal to sell on the part of the manufacturers is connected with and a part of the scheme which includes the enhancement of the price of the unset tiles by the San Francisco dealers. The whole thing is so bound together that when looked at as a whole the sale of unset tiles ceases to be a mere transaction in the State of California, and becomes a part of a purpose which, when carried out, amounts to and is a contract or combination in restraint of interstate trade or commerce."

So, in *Swift & Co.* v. *United States*, 196 U. S. 375, 396: "The scheme as a whole seems to us to be within reach of the law. The constituent elements, as we have stated them, are enough to give to the scheme a body, and for all that we can say, to accomplish it. Moreover, whatever we may think of them separately, when we take them up as distinct charges, they are alleged sufficiently as elements of the scheme. It is suggested that the several acts charged are lawful and that intent can make no difference. But they are bound together as the parts of a single plan. The plan may make the parts unlawful. *Aikens* v. *Wisconsin*, 195 U. S. 194, 206."

In *Bement* v. *National Harrow Company*, 186 U. S. 70, 87, 88, the court, after referring to that section of the act of Congress relating to suits by the Attorney General and by persons injured in their business or property, said: "Assuming that the plaintiff is right so far as regards any suit brought under that act, we are nevertheless of opinion that any one sued upon a contract may set up as a defense that it is a violation of the act of Congress, and if found to be so, that fact will constitute a good defense to the action. The first section of the act provides that 'every contract, combination in the form of trust, or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.' Every person making such a contract is deemed guilty of a misdemeanor, and on conviction is to be punished by fine or by imprisonment, or both. As the statute makes the contract in itself illegal, no recovery can be had upon it when the defense of illegality is shown to the court. The act provides for the prevention of violations thereof, and makes it the duty of the several district attorneys, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations, and it gives to any person injured in his business or property the right to sue, but that does not prevent a private individual when sued upon a contract which is void as in violation of the act from setting it up as a defense, and we think when proved it is a valid de-

fense to any claim made under a contract thus denounced as
illegal."

Again, in the recent case of *Loewe* v. *Lawlor*, 208 U. S. 274,
301, which involved the inquiry whether certain acts could be
regarded as in restraint of interstate commerce, the court said:
"So that, although some of the means whereby the interstate
traffic was to be destroyed were acts within a State and some
of them were in themselves as a part of their obvious purpose
and effect beyond the scope of Federal authority, still, as we
have seen the acts must be considered as a whole, and the plan
is open to condemnation, notwithstanding a negligible amount
of intrastate business might be affected in carrying it out.  If
the purpose of the combination was, as alleged, to prevent any
interstate transportation at all, the fact that the means oper-
ated at the one end before physical transportation commenced
and at the other end after the physical transportation ended,
was immaterial."    See also *Gibbs* v. *Baltimore Gas Co.*, 130
U. S. 396, 412.

The adjudged cases all hold that upon the question whether
the particular contract sought to be enforced arises out of an
illegal transaction, the court will not be restricted to a partial
statement of the facts but will consider all the circumstances
connected with the transaction so as to ascertain its real na-
ture.  In *Addyston Pipe & Steel Co.* v. *United States*, 175 U. S.
211, 247, the court said that "all the facts and circumstances
are, however, to be considered in order to determine the fun-
damental question whether the necessary effect of the com-
bination is to restrain interstate commerce."

Upon the whole case, and without further citation of au-
thorities, we adjudge, upon the admitted facts, that the com-
bination, represented by the plaintiff in this case, was illegal
under the Anti-Trust Act of 1890; that it is to be taken as one
intended, and which will have the effect directly, to restrain
and monopolize trade and commerce among the several States
and with foreign States; and that the plaintiff cannot have a
judgment for the amount of the account sued on, because, for

the reasons we have stated, such a judgment would, in effect, aid the execution of the agreements which constituted that illegal combination.    We consequently hold that the Circuit Court of Appeals properly sustained the third defense, and rightly dismissed the suit.    Its judgment must be affirmed.

*It is so ordered.*

MR. JUSTICE HOLMES, with whom concurred MR. JUSTICE BREWER, MR. JUSTICE WHITE and MR. JUSTICE PECKHAM, dissenting.

This action is for goods admitted to have been sold and delivered by the plaintiff to the defendant, and the question arises, as has been explained, on demurrer to the third defense. The elements of that defense may be stated in a few words. Nearly all the manufacturers of wall paper in the United States formed a combination which, under the present policy of the law, was an illegal attempt to restrain and monopolize trade in and among the several States.    As a part of the scheme the plaintiff corporation was created, which by the agreement became the purchaser of the products of the constituent companies, and was to sell the same, although the constituent companies continued to manufacture and to carry on the business of soliciting orders.    The only material facts about this agreement are that under it the plaintiff got title to the goods, that it fixed prices at which goods were to be sold, and that it contemplated compelling the jobbers and others who bought to purchase at those prices, if they were to get any paper at all. The conspirators threatened and had the power to drive any jobber out of business who did not come in.

In pursuance of the combination and its purpose the defendant, a jobbing house, and all other jobbers, were compelled to sign a contract which, in effect, bound them to buy all the wall paper needed in their business from the plaintiff at the above-mentioned prices, and which made it an "essential condition of this agreement" that they should not sell at lower prices

or upon better terms than those at which the plaintiff sold. After these two contracts were made the defendant ordered the goods in question at the prices named. It is alleged that those prices were unreasonable, and it is alleged, repeatedly and with much detail, that all the arrangements were made and all the business was done in furtherance of the plan set forth, contrary to the law of the United States and of the States concerned, and in violation of the defendant's rights, this suit being the final step in the attempt to carry out the plan.

It seems to me that the foregoing facts show no defense. I will consider them in their successive degrees of connection with the affair, and in the first place will take up the terms of the actual contracts in suit. These were ordinary parol sales made by the owner of goods. The suit was not upon the general agreement between the plaintiff and defendant. That by itself sold nothing, and it may be questioned whether it purported absolutely to bind the defendant to buy a roll of paper. See *Dennis* v. *Slyfield*, 117 Fed. Rep. 474; *Sterling Coal Co.* v. *Silver Spring Bleaching & Dyeing Co.*, 162 Fed. Rep. 848, 850. The actual contracts by which the plaintiff bound itself to deliver, and the sales under which it did deliver the specific goods for which it seeks to recover the price, were made after the making of the general agreement, as it is apparent on the face of that agreement that they must have been, and as is alleged by the answer in so many words. Each was a separate transaction. There is nothing alleged concerning the terms of these parol sales that has any element of illegality about it.

Next as to the effect of the general agreement between the plaintiff and defendant. It is alleged that after it was made the members of the combination solicited, received and filled orders, and charged the prices fixed in the original combination agreement. It is not alleged that either agreement was referred to even by implication. The sales are left by the answer as so many distinct transactions. But if, in order to help the defendant to escape, we are to infer that the orders were given with implied reference to the general contract, what ef-

fect could such a reference have? Plainly only to fix the price, and for this purpose it was simply a schedule, figures on a piece of paper or in the memory of the parties, which were adopted by pointing to them in some way, as if they had been written on a blackboard. It did not matter whether the document pointed at was lawful or unlawful, as the whole business was done by the later contracts. See *Interstate Consolidated Street Ry. Co.* v. *Massachusetts,* 207 U. S. 79, 84, 85.

If the condition in the general agreement between the plaintiff and defendant made it bad, still it went only to that agreement and to the plaintiff's promise to sell at certain prices, not to any subsequent sales, or to the defendant's title to goods got under subsequent sales. If it had been incorporated in any way into the specific sales, it would be necessary to consider the case of *Cincinnati, Portsmouth, Big Sandy & Pomeroy Packet Co.* v. *Bay,* 200 U. S. 179, 185. But no such incorporation is alleged, or in any probability could have been alleged. So I think that I may assume that the parol sales were made no worse, on their face, by any reference to the content of the general agreement. And I may add that the unlawfulness of the general agreement would not make the sales bad from the outside, so to speak, if that was all that there was against them. A lawful purchase is not made unlawful merely by being the fulfillment of an unlawful contract.

It has been suggested that the plaintiff was not the real seller and only got its standing from the general agreement with the defendant, and that therefore it had to rely upon an illegal contract to make out its case. But the defense does not deny that the plaintiff became the owner of the goods or that the manufacturers sold in its name as the original combination provided. It is true that it says that the arrangements were made with a view of disguising the real transaction and purpose, and that really the business was to be done by the manufacturers, as I have stated. But it adds that payments were to be made to the plaintiff, and it nowhere suggests that the first contract set forth did not operate, or that the plaintiff

did not get the title it professed to transfer. Its illegality would not prevent the title passing. If the defendant meant to deny that it bought from the plaintiff goods which the plaintiff owned, it was very easy to deny it and to leave the plaintiff to set up the agreement if it did not join issue, as it naturally would. As the defense stands, I think it means, as I have no doubt is the fact, that the technical legal title to the goods was in the plaintiff, and that the defendant purported to contract with it, the manufacturers selling in its name.

I now pass to the more remote considerations that are supposed to have a greater effect. It is said that the specific sales, the general agreement and the original combination all are steps in one illegal plan, and that the plan gives character to the whole. But we must be more precise. The plaintiff alone was party to the plan. The defendant represents itself as a victim, and says that the plan was against its rights. On what ground then does the illegal purpose of the plaintiff warrant the defendant in professing to buy its goods and then refusing to pay for them?

The plaintiff's unlawful purpose did not make it unlawfu to buy the plaintiff's goods. It is decided, if decision is necessary, that a purchaser cannot escape merely on the ground that the seller is an unlawful trust. *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540; *Chattanooga Foundry & Pipe Works* v. *Atlanta*, 203 U. S. 390, 397. I repeat that it is not alleged that the defendant in any way shared the plaintiff's intent, but to go further than I need, I will assume that it may be taken to have made the general contract with knowledge of that intent. But it cannot be contended that, therefore, it was party to a transaction illegal for that reason. Whenever a party knows that he is buying from an illegal trust, and still more when he buys at a price that he thinks unreasonable but is compelled to pay in order to get the goods he needs, he knows that he is doing an act in furtherance of the unlawful purpose of the trust, which always is to get the most it can for its wares. But that knowledge makes no difference, because the policy of not

furthering the purposes of the trust is less important than the policy of preventing people from getting other people's property for nothing when they purport to be buying it. And if knowledge of the purchaser that he is furthering the purpose of the trust makes no difference, it makes no difference whether he is glad or sorry for the result. A man does not make conduct otherwise lawful unlawful simply by yearning that it should be so. In this case however the defendant was an unwilling accessory, exactly as Dee was in the *Connolly Case.*

The effect of the defendant's knowledge of the plaintiff's scheme is not greater because it signed the illegal general contract. I think that I have shown that the illegality of that contract, taken by itself, did not make the specific sale illegal, and from the point of view that all that was done was a carrying out of the plaintiff's illegal scheme, it does not matter to the legality of the sales whether a particular previous step was legal or not. If knowledge that the plaintiff was attempting to monopolize, and that it sold at prices fixed in aid of the intent would not exonerate the defendant when it yielded to its necessities and bought, the same knowledge would have no greater effect if the same necessities led it to agree beforehand to do what it did.

Perhaps, in order to answer every aspect that this rambling defense presents, I ought to say in conclusion that the allegations that the price was unreasonable, and that the plaintiff threatened and had power to drive jobbers out of business that did not come into its arrangement, is not stated in such form as to make a case of duress. I think that that would have been the strongest ground on which the defense could have been put. Courts and legislation sometimes have recognized that the so-called freedom to contract or not may be made illusory by the economic situation of one of the parties. *Schlemmer* v. *Buffalo, Rochester & Pittsburg Ry. Co.*, 205 U. S. 1, 12. It would be extending the recognition further than it yet has been extended, so far as I am aware, to apply it to a case like this. But I express no opinion upon its possible ap-

plication because, as I have said, the allegations are not directed to that end, and do not sufficiently show that the specific purchases were induced by fear. Moreover, as such duress, like fraud, goes only to motives, *The Eliza Lines*, 199 U. S. 119, 131, if the frightened or defrauded party would rescind he must restore the consideration, or at least be ready to pay the reasonable price, of neither of which is there any hint.

I think that this decision must mean that *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, ought to have been decided the other way. There, as here, there was, or was assumed to be, an illegal trust. In furtherance of the purposes of the trust a general agreement was made between the trust and the defendants, the purchasers, which required defendants to buy from the plaintiff alone at prices alleged to be unreasonable, they receiving a rebate upon that consideration, and which fixed a price at which the defendants would sell. There was just as much of a scheme and just the same scheme in that case as in this. In both the defendants coöperated as victims to the monopoly in precisely the same way. The facts spoke for themselves, and were the same. Nothing is added to the case by calling the arrangements set forth a scheme, but similar language was used in the former case, as appears from the record. The contract will be found in the same record. It was assigned as error and argued that the Circuit Court ruled that the said contract, again set forth, was not void. For these reasons I feel compelled to dissent from the judgment of the court. I am authorized to say that Mr. Justice Brewer, Mr. Justice White and Mr. Justice Peckham concur in this dissent.

Mr. Justice Brewer, dissenting.

Concurring in the views expressed by Mr. Justice Holmes, it seems to me another matter is worthy of consideration.

The transactions between the plaintiff and defendant were, as held by the court, in violation of the Anti-Trust Act, 26

Stat. 209. That act defines the rights and liabilities of the parties. The first three sections prohibit contracts and combinations in restraint of trade and monopolies; declare a person violating the provisions of these sections guilty of a misdemeanor and prescribe the punishment. Section 4 gives power to the Circuit Courts of the United States to prevent and restrain violations of the act. Section 6 provides for a forfeiture of property owned under any contract or combination or pursuant to any conspiracy, and seized while in course of transportation. Section 7 declares that any person injured in his business or property by reason of anything forbidden or declared to be unlawful in the act may sue therefor in any Circuit Court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover threefold damages by him sustained.

The present case comes within the proposition that "where a statute creates a new offense and denounces the penalty, or gives a new right and declares the remedy, the punishment or the remedy can be only that which the statute prescribes." *Farmers & Mechanics' National Bank* v. *Dearing*, 91 U. S. 29, 35; *Barnet* v. *National Bank*, 98 U. S. 555. These two cases arose under the National Banking Act of June 3, 1864, c. 106, 13 Stat. 99, and illustrate the doctrine referred to. That act prescribed the rate of interest which might be taken by national banks, and added that knowing and receiving a greater rate of interest should forfeit the entire interest; or if the interest had been paid, that the person paying might recover in an action of debt twice the amount of interest thus paid. These cases held that relief for a violation of the statute was a forfeiture of the interest due and not paid, or in case the interest had been paid an action of debt to recover double the amount paid. See also *Oates* v. *National Bank*, 100 U. S. 239.

In *Stephens* v. *Monongahela Bank*, 111 U. S. 197, it was decided that the remedy prescribed by the statute was exclusive. In *Driesbach* v. *National Bank*, 104 U. S. 52, it was held that usurious interest paid a national bank on renewing a series of

notes could not in an action by the bank on the last of them be applied in satisfaction of the principal of the debt.

Now, the remedies given in the Anti-Trust Act are three in number: First, a criminal prosecution; second, a forfeiture of property; and, third, an action by any person injured to recover threefold the damages by him sustained. These being the remedies prescribed, are exclusive. The defendant sought neither of these remedies. It was not so anxious for the public welfare as to make complaint and secure criminal proceedings. There was no property to be forfeited. It did not seek to recover threefold the damage it had sustained, but only to avoid paying for the property it had purchased. The reason therefor is suggested in the opinion of the Circuit Court of Appeals, 148 Fed. Rep. 939, 950:

"The averment that they paid 50 per cent more for their gross purchases in consequence of the illegal combination has little merit in it, moral or otherwise. They doubtless sold again at the great minimum profit they agreed to exact from retailers, and the retailers later exacted the undue profit from the consuming public."

Something of the same idea of the exclusiveness of a statutory remedy finds expression in *Texas & Pacific Railway Company* v. *Abilene Cotton Oil Company*, 204 U. S. 426, in which it was held that a carrier could not maintain an action at common law for excessive and unreasonable freight charges exacted on interstate shipments, where the rates charged were those which had been duly fixed by the carrier according to the interstate commerce act, and had not been found to be unreasonable by the Interstate Commerce Commission, and this notwithstanding the provision in § 22 of the act to regulate interstate commerce: "Nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies."