## 3771. WILDER MANUFACTURING COMPANY v. CORN PRODUCTS REFINING COMPANY.

Suit was brought to recover the purchase-price of goods sold and delivered. The defendant pleaded that the plaintiff was an unlawful combination and conspiracy, formed for the purpose of restraining interstate trade, in violation of the acts of Congress; that through a system of contracts with various purchasers it had secured a monopoly of the business, and that the defendant was forced to purchase the commodity from the plaintiff upon whatever terms could be made. The contract of sale was in writing, and provided that the seller would set aside, out of its profits from the manufacture and sale of the commodity for a certain period, an amount equal to ten cents per hundred pounds on all purchases of the commodity which should be made by the plaintiff during a certain period. It was agreed that this rebate or discount should be paid to the defendant at the end of the year next succeeding the period above mentioned, on condition that for the remainder of the previous year and during the whole of the next year the defendant should have purchased the commodity exclusively from the plaintiff. It was averred, in the answer, that under the working of this system of contracts, each purchaser was placed and kept in a situation whereby, if any competing firm entered into the business, the purchaser, by dealing with such competing firm, would sacrifice a large rebate on the last year's purchases of goods. It was further averred that the entire system of contracts was designed for the purpose of preventing competition, and did in fact prevent competition. It was further averred that the prices charged by the plaintiff were unreasonable, and that each order for goods bought by the defendant contained a clause reciting that the goods were for consumption by the defendant only, and not for resale. It was further averred that the original combination, the series of contracts referred to in the answer, the stipulation against resale, and the individual sales, all constituted elements of a general plan or design, which in its entirety constituted a combination or conspiracy intended and having the effect to restrain and monopolize interstate trade and commerce, in violation of the Sherman anti-trust act of July 2, 1890; and that the account upon which the suit was brought was made up, in the knowledge of both the defendant and the plaintiff, with direct reference to the agreement heretofore referred to. *Held*, that the facts set forth in the answer constituted no defense to the action, and that the answer was properly stricken, on motion in the nature of a general demurrer. The case of Continental Wall Paper Co. *v.* Voight, 212 U. S. 227, is distinguishable from the present case, which falls within the principle announced in Connally *v.* Union Sewer Pipe Co., 184 U. S. 539.

Russell, J., dissenting. I think the case is fully controlled by the ruling of the Supreme Court of the United States in the case of Continental Wall Paper Co. *v.* Voight, supra, and that the court erred in striking the defendant's answer.

DECIDED OCTOBER 2, 1912.

Complaint; from city court of Atlanta—Judge Reid. September 22, 1911.

The Corn Products Refining Company brought its action against the D. R. Wilder Manufacturing Company upon an open account for goods sold and delivered. The defendant filed an answer, admitting the purchase of the goods at the price stated in the account, but set up the following defense: "The defendant further shows to the court that the plaintiff is an unlawful combination and conspiracy in restraint of interstate trade, being a corporation formed by the consolidation of the Glucose Refining Co., the American Glucose Co., the United States Sugar Refining Co., the Pope Glucose Co., the Illinois Sugar Refining Co., the National Starch Co., the United Starch Co., the Corn Products Co., the Warner Sugar Refining Co., the St. Louis Syrup & Preserving Co., the New York Glucose Co., and many other firms and corporations which, before the formation of the plaintiff company, were independent and competing manufacturing concerns, manufacturing and selling goods of the kind sued for in the plaintiff's complaint. Said combination was for the purpose of monopolizing and restraining interstate trade in the products handled by the plaintiff, and did result in a monopoly of interstate trade, and in greatly advancing the price at which said commodities were sold, and constituted a combination or conspiracy in violation of the Federal statute. Shortly after said combination was effectuated, and while the plaintiff controlled an absolute monopoly of the glucose and grape-sugar industry, the plaintiff inaugurated a system of contracts with its purchasers, which it referred to as its 'profit-sharing plan.' Under said system of contracts it agreed to give to its purchasers a rebate of some certain amount per hundred pounds upon all purchases of glucose or grape sugar during any years, provided and upon the condition that the said purchaser, during the following year, gave to the said Corn Products Refining Co. its exclusive patronage. All of said contracts were substantially similar, except that the amount of the rebate varied from year to year. The defendant attaches hereto, as Exhibit 'A,' a copy of the contract relative to the rebate on its 1906 business, under which it was agreed to give the defendant a rebate of 10 cents per hundred pounds on all shipments of glucose purchased by it from the plaintiff during 1906, provided it gave to the plain-

tiff its exclusive trade during the year 1907. A substantially similar contract was entered into relative to trades in 1907, and relative to trades in 1908 and 1909, with this difference relative to the two latter years, viz., that the rebate was advanced from 10 cents to 15 cents per hundred pounds. The defendant alleges that substantially similar contracts were given to practically all consumers of glucose and grape sugar in the United States. The defendant alleges that at the time said so-called profit-sharing plan was originated, the plaintiff was the sole firm or corporation in the United States manufacturing and selling glucose and grape sugar, having absorbed all independent and competing concerns, and this defendant and the other manufacturing plants which consumed glucose or grape sugar in the United States were forced to purchase from the plaintiff upon whatever terms could be made, a part of which terms are embraced in this so-called profit-sharing plan.

"Under the working of said system of contracts each purchaser of glucose or grape sugar was placed and kept in a situation whereby, if any independent or competing firm or corporation entered into the business of manufacturing or selling glucose or grape sugar, such purchaser, by dealing with such independent or competing firm, would sacrifice a large rebate on the previous year's business by giving his trade to such independent or competing concern. The entire system of contracts herein outlined, and the contracts hereinafter referred to, were designed for the purpose of preventing competition from arising in the business which had previously been monopolized by the plaintiff company, and did, in fact, have such effect to a large extent. Defendant alleges that the plaintiff advanced the price of glucose and grape sugar to such exorbitant extent that a few independent concerns have been created and are now attempting to compete with the plaintiff, and are offering lower prices than those asked by the plaintiff, but are having great difficulty in doing so, because of the fact that the plaintiff has heretofore obtained a hold upon so large a part of the consumers, through the working of the system of contracts heretofore described as the so-called profit-sharing plan. The plaintiff is claiming that any consumer who now trades with the said independent concerns forfeits to the plaintiff the rebate on the 1908 business, and is thereby coercing a large number of con-

sumers into buying from the plaintiff at its advanced prices. The defendant alleges that the prices charged by the plaintiff, even after deducting the rebates, are in excess of the prices charged by the independent firms that are now attempting to compete with the plaintiff, and the price heretofore charged for glucose and grape sugar prior to organization of the plaintiff company, but that the immediate sacrifice claimed by the plaintiff against any consumer who trades with independent concerns as heretofore described is so great, and so many consumers are uncertain that said independent concerns will continue to do business, that the plaintiff is able to control and coerce a large part of the trade, and still controls a partial monopoly of the trade.

"The defendant shows that each purchase made by it, and by other purchasers, from the Corn Products Refining Co. contained the following clause in the contract of purchase: 'The goods herein sold are for your own consumption only, and not for resale.' The defendant shows that the sales for the purchase-price of which suit is brought were made under the system of contracts herein outlined. The defendant shows that the original combination, the series of contracts known as the profit-sharing plan, the provision heretofore referred to in the contracts of sale, and the individual sales, all constituted elements of one general plan or design, which in its entirety constitutes a combination or conspiracy intended and having the effect directly to restrain and monopolize interstate trade and commerce in violation of the Federal anti-trust act of July 2, 1890. The defendant alleges that the account on which suit is brought was made up, within the knowledge of both it and the plaintiff, with direct reference to and in execution of the agreement heretofore referred to, and that there can not be a recovery upon said account. Defendant avers that under its contract with the plaintiff for 1908, the plaintiff agreed to allow the defendant a rebate of 15 cents per hundred pounds on all purchases of glucose and grape sugar during the year 1908 upon the conditions heretofore set out. The defendant avers that 15 cents per hundred pounds upon all of its purchases for 1908 amounts to the sum of $1,797.01. The defendant alleges that the limitation or condition in said contract that it should trade only with the plaintiff, is illegal, being in restraint of interstate trade in violation of the Federal anti-trust act as here-

tofore alleged, and is, therefore, not binding upon this defendant, and that this defendant is entitled to said amount notwithstanding its failure to comply with said condition. The defendant therefore prays that said amount be allowed as a counter-claim against the plaintiff and that it may have judgment for said amount."

The contract between the parties, evidencing what is termed in the answer the "profit-sharing plan," was in the form of a letter as follows (addressed to the defendant company and signed by the plaintiff): "This company, recognizing the fact that its own prosperity, in a great measure, is interwoven with the good-will and co-operation of its patrons, has decided to adopt a liberal plan of profit-sharing with you, in case you shall in the future continue to give us your exclusive patronage. This company inaugurates such a policy of profit-sharing, by announcing that it will set aside, out of its profits from the manufacture and sale of glucose and grape sugar for the last six months of 1906, an amount equal to 10 cents per hundred pounds on all shipments of glucose and grape sugar (Warner's Anhydre and Bread Sugar excepted) which shall have been made to you by this company from July 1st to December 31, 1906. This amount will be paid to you or your successors on December 31, 1907, on condition that for the remainder of the year 1906 and the entire year 1907 you or your successors shall have purchased exclusively from this company or its successors all the glucose and grape sugar required for use in your establishment. With the assurance of steadfast co-operation of its customers, given in reciprocation for the benefits conferred upon them, this company confidently anticipates a continuance of such profit-sharing distribution annually to the full extent that its earnings may warrant."

The plaintiff moved to strike the answer, and the motion was sustained. The opinion of the trial judge was thus expressed in his order: "This motion is sustained and the defendant's plea is stricken. The defendant never having made any contract to buy exclusively from the plaintiff, this case does not, in my opinion, come within the decision in the case of Continental Wall Paper Co. *v.* Voight, 212 U. S. 227." The defendant excepted.

*Smith, Hastings & Ransom,* for plaintiff in error.

*J. W. Austin,* contra.

POTTLE, J. We do not find it necessary to discuss at any great length the question whether, conceding the facts alleged in the answer to be true, the plaintiff is an unlawful combination within the meaning of the Federal anti-trust act. The answer was clearly subject to special demurrer. The allegation that the plaintiff is an unlawful combination and conspiracy in restraint of interstate trade, and was formed for the purpose of monopolizing and restraining trade, is clearly a conclusion of the pleader, and no sufficient facts seem to be alleged to support this conclusion and bring the case within the recent decisions of the Supreme Court of the United States in Standard Oil Co. v. United States, 221 U. S. 1 (55 L. ed. 619, 31 Sup. Ct. 502, 34 L. R. A. (N. S.) 834), and United States v. American Tobacco Co., 221 U. S. 106 (55 L. ed. 663, 31 Sup. Ct. 132). But, in view of the fact that there was no special demurrer to the answer, but only a general motion to strike made at the trial term, it may be that, under the practice prevailing in this State, the general averment that the plaintiff corporation is an unlawful combination and conspiracy in restraint of interstate trade, formed for the purpose of monopolizing such trade, and did in fact result in a monopoly of interstate trade and in greatly advancing the price at which the commodities controlled by the plaintiff were sold, is sufficient to show that the plaintiff is an illegal combination, under the Federal anti-trust act. However, as stated, we make no express ruling on this question.

For the purposes of this case we may concede that the plaintiff is such an illegal combination and conspiracy in restraint of interstate trade as that it would be subject to the penalties imposed by the Sherman anti-trust act. It by no means follows, however, that the defendant can avoid paying for the goods sold by the plaintiff and consumed by the defendant. In the case of Connolly v. Union Sewer Pipe Co., 184 U. S. 540 (46 L. ed. 679, 22 Sup. Ct. 431), it was expressly ruled by the Supreme Court of the United States that a violation of the Sherman anti-trust act by a combination in restraint of trade, by which a penalty is incurred under the statute, does not prevent the company from recovering under a contract for the purchase-price of goods. Mr. Justice Harlan delivered the opinion of the court in that case, saying, among other things, "If the contract between the plaintiff corporation and the other named corporations, persons, and com-

38

panies, or the combination thereby formed, was illegal under the act of Congress, then all those, whether persons, corporations, or associations, directly connected therewith, became subject to the penalties prescribed by Congress. But the act does not declare illegal or void any sale made by such combination, or by its agents, of property it acquired or which came into its possession for the purpose of being sold,—such property not being at the time in the course of transportation from one State to another or to a foreign country. The buyer could not refuse to comply with his contract of purchase upon the ground that the seller was an illegal combination which might be restrained or suppressed in the mode prescribed by the act of Congress; for Congress did not declare that a combination illegally formed under the act of 1890 should not, in the conduct of its business, become the owner of property which it might sell to whomsoever wished to buy it. So that there is no necessary legal connection here between the sale of pipe to the defendants by the plaintiff corporation and the alleged arrangement made by it with other corporations, companies, and firms. The contracts under which the pipe in question was sold were, as already said, collateral to the arrangement for the combination referred to, and this is not an action to enforce the terms of such arrangement. That combination may have been illegal, and yet the sale to the defendants was valid."

The plaintiff in error relies upon the decision of the Supreme Court of the United States in Continental Wall Paper Co. *v.* Voight, 212 U. S. 226 (53 L. ed. 486, 29 Sup. Ct. 280). In that case the Continental Wall Paper Company brought suit upon an open account to recover the agreed price of goods sold to the defendant. The defense relied upon was that the plaintiff was an unlawful combination and conspiracy in restraint of interstate trade, in violation of the Sherman anti-trust act, and facts are set forth in great detail in support of this allegation. It appeared that the plaintiff was a combination of a number of smaller companies which had been engaged in the manufacture and sale of wall paper, and that these several companies entered into a written agreement with the Continental Wall Paper Company, which the Supreme Court construed to constitute a conspiracy to restrain interstate trade and form a monopoly for the purpose of controlling the manufacture and sale of wall paper, in violation of the anti-

trust act. It appeared that it was part of the agreement actually entered into between these various companies that all jobbers and other wholesalers of wall paper should be forced to sign an agreement binding themselves to purchase their entire stock of wall paper, nominally, either from the plaintiff or from the corporations or firms which had combined to form the large corporation, at the prices fixed by the combination, and that the jobbers and wholesalers should sell only at prices fixed by the seller, under penalty, which the combination of all the corporations and firms enabled them to enforce, that such jobbers or wholesalers, in case of a refusal to accede to the terms so imposed, or in case of a violation thereof, should be unable to buy wall paper, should be driven out of business, and should sacrifice the good will and capital therein invested. It further appeared that the defendant and every other purchaser of wall paper from the combination or from any one of its constituent companies was required to enter into a written agreement, the substantial terms of which were as follows: The company agreed to sell subject to such credit limitations as it might impose, and the jobber agreed to purchase the entire stock required in his business of selling wall paper, to the amount of a certain gross value, without discounts, the jobber reserving to himself the right to purchase such merchandise as he might need in excess of this amount from others. The jobber was allowed certain discounts at rates shown in a schedule accompanying the agreement and made a part thereof. Attached to the agreement was a schedule of "road" prices at which the company agreed to sell its goods for the term embraced in the contract to dealers other than jobbers, and also a statement of discounts allowed to such customers, other than jobbers, for quantity purchases, together with the terms of credit and freight allowance to which such customers were entitled. The agreement further provided: "It is an essential condition of this agreement that the jobbers will not, directly or indirectly, sell or offer for sale any of the merchandise purchased from the company hereunder at lower prices or upon better or more favorable terms than those shown in schedule 'B,' the intent hereof being to assure the company against the use by the jobbers of this agreement to undersell the company." The prompt performance by the jobber of all the terms of the agreement was made a condition precedent to the exaction of the

continuous performance of the agreement by the company. With each order for goods the purchaser was required to sign an agreement "not to sell any of such goods to others on terms better or more favorable than those specified in the above schedule nor lower than said list prices, and our faithful performance of this agreement is a condition precedent to the filling of our order. The intent hereof is to protect you fully against being undersold by us among customers to whom you do [not] allow quantity discounts."

The view of the Supreme Court in that case may best be gathered from the following excerpts from the opinion of the majority, written by Mr. Justice Harlan: "The present case is plainly distinguishable from the Connolly case. In that case the defendant, who sought to avoid payment for the goods purchased by him under contract, had no connection with the general business or operations of the alleged illegal corporation that sold the goods. He had nothing whatever to do with the formation of that corporation, and could not participate in the profits of its business. His contract was to take certain goods at an agreed price, nothing more, and was not in itself illegal, nor part of nor in execution of any general plan or scheme that the law condemned. The contract of purchase was wholly collateral to and independent of the agreement under which the combination had been previously formed by others in Ohio. It was the case simply of a corporation that dealt with an entire stranger to its management and operations and sold goods that it owned to one who wished to buy them. In short, the defense in the Connolly case was that the plaintiff corporation, although owning the pipe in question and having authority to sell and pass title to the property, was precluded by reason alone of its illegal character from having a judgment against the purchaser. We held that the defense could not be sustained, either upon the principles of the common law or under the anti-trust act of Congress. The case now before us is an entirely different one. The Continental Wall Paper Company seeks, in legal effect, the aid of the court to enforce a contract for the sale and purchase of goods, which, it is admitted by the demurrer, was in fact and was intended by the parties to be based upon agreements that were and are essential parts of an illegal scheme. We state the matter in this way because the plaintiff, by its demurrer, admits, for the purposes of this case, the truth of all the facts alleged in the third

defense. It is admitted by the demurrer to that defense that the account sued on has been made up in execution of the agreements that constituted or out of which came the illegal combination formed for the purpose and with effect of both restraining and monopolizing trade and commerce among the several states. The present suit is not based upon an implied contract of the defendant company to pay a reasonable price for goods that it purchased, but upon agreements, to which both the plaintiff and the defendant were parties, and pursuant to which the accounts sued on were made out, and which had for their object, and which it is admitted had directly the effect, to accomplish the illegal ends for which the Continental Wall Paper Company was organized. If judgment be given for the plaintiff, the result, beyond all question, will be to give the aid of the court in making effective the illegal agreements that constituted the forbidden combination. These considerations make it evident that the present case is different from the Connolly case. In that case the court regarded the record as presenting the question whether a voluntary purchaser of goods at stipulated prices, under a collateral, independent contract, can escape an obligation to pay for them upon the ground merely that the seller, which owned the goods, was an illegal combination or trust. We held that he could not, and nothing more touching that question was decided or intended to be decided in the Connolly case. The question here is whether the plaintiff company can have judgment upon an account which, it is admitted by demurrer, was made up, with the knowledge of both seller and buyer, with direct reference to and in execution of certain agreements under which an illegal combination, represented by the seller, was organized. Stated shortly, the present case is this: The plaintiff comes into court admitting that it is an illegal combination whose operations restrain and monopolize commerce and trade among the states, and asks a judgment that will give effect, as far as it goes, to agreements that constituted that combination, and by means of which the combination proposes to accomplish forbidden ends. We hold that such a judgment can not be granted without departing from the statutory rule, long established in the jurisprudence of both this country and England, that a court will not lend its aid, in any way, to a party seeking to realize the fruits of an agreement that appears to be tainted with illegality, although the

result of applying that rule may sometimes be to shield one who has got something for which, as between man and man, he ought, perhaps, to pay, but for which he is unwilling to pay." The present Chief Justice and Justices Holmes, Brewer, and Peckham dissented, being of the opinion that the case fell within the principle of the decision in Connolly *v.* Union Sewer Pipe Company; Mr. Justice Brewer being also of the opinion that the defense was not well founded for the additional reason that where a statute created a new offense and fixed the penalty, or gave a new right and declared the remedy, the punishment or the remedy could be only that which the statute prescribed. His view as to this point was thus tersely expressed: "Now, the remedies given in the anti-trust act are three in number: First, a criminal prosecution; second, a forfeiture of property; and, third, an action by any person injured to recover threefold the damages by him sustained. These, being the remedies prescribed, are exclusive. The defendant sought neither of these remedies. It was not so anxious for the public welfare as to make complaint and secure criminal proceedings. There was no property to be forfeited. It did not seek to recover threefold the damage it had sustained, but only to avoid paying for the property it had purchased."

This court yields ready assent to any decision of the Supreme Court of the United States involving the construction and effect of a Federal statute. We will give to the decision of that court in the case last mentioned above full scope and effect, but at the same time we can not bring our minds to agree to the opinion of the majority in that case. On the contrary, we believe that the opinion expressed by the dissenting Justices is the sounder and better view of the law. The Federal courts have exclusive power to decree illegal a combination formed in violation of the anti-trust act. The illegality of such a combination should be determined by a direct proceeding brought for that purpose in the Federal court, in accordance with the procedure and practice in that court, where the corporation assailed has full opportunity to be heard. It ought not to be open to collateral attack in every minor State court where it may bring an action to enforce one of its contracts of sale. In view of the opinion of the Supreme Court of the United States in the Standard Oil Company and American Tobacco Company cases, it is very doubtful whether that

court as now constituted will follow this decision. In the Standard Oil Company case the court, in construing the Sherman act, expressed the following view: "The statute under this view evidenced the intent not to restrain the right to make and enforce contracts, whether resulting from combination or otherwise, which did not unduly restrain interstate or foreign commerce, but to protect that commerce from being restrained by methods, whether old or new, which would constitute an interference,—that is, undue restraint. . . Thus not specifying, but indubitably contemplating and requiring a standard, it follows that it was intended that the standard of reason which had been applied at the common law and in this country in dealing with subjects of the character embraced by the statute was intended to be the measure used for the purpose of determining whether, in a given case, a particular act had or had not brought about the wrong against which the statute provided." Under this decision the question of the illegality of the combination under the anti-trust act becomes a mixed question of law and fact. It involves a consideration of the details of the business of the alleged unlawful combination, the purposes for which it was formed, the manner in which its business is conducted, and more frequently involves a consideration of complicated facts which ought not to be considered by a jury in a State court, impaneled only to try the question whether a purchaser of goods from a combination should pay for the goods which he has bought and consumed. Suppose, for instance, that the jury impaneled in the case now for decision should determine that the plaintiff is an illegal combination and conspiracy, and that the contract of sale sued on was illegal and void. Another jury, impaneled to pass upon exactly the same issue, in a suit of exactly the same kind might reach an exactly opposite conclusion. Thus, the plaintiff would be in a helpless condition, with its very business life in the balance and compelled to try the issue of its right to exist before every jury impaneled to try the question of its right to recover for goods which it had sold and delivered. We do not believe this to be the law, and we are of the opinion that every consideration of sound public policy and the settled principles of law compel a contrary conclusion. But let us see what the scope and effect of the decision in the case of Continental Wall Paper Co. v. Voight is, and then determine whether the decision reached by the

majority of the court in that case compels us to hold that the facts set forth in the defendant's answer in the present case show that the contract sued on is illegal and incapable of enforcement.

In the Continental Wall Paper Company case the defendants were virtually compelled to sign a jobber's agreement which in effect bound them to buy from the plaintiff all the wall paper needed in their business, at certain fixed prices, and not to sell at lower prices or upon better terms than those upon which the plaintiff itself sold to dealers other than jobbers. It appeared that the prices thus agreed on were unreasonable; that the plaintiff had practically a monopoly of the manufacture and sale of wall paper, and that the account was made up, "within the knowledge of both buyer and seller, with direct reference to and in execution of the agreements which constituted the illegal combination." The court held, in effect, that the defendants in that case were particeps criminis; that by their contracts they became a part of the illegal combination and conspiracy; that they entered into these contracts for the purpose of furthering the conspiracy; that they knowingly and intentionally became parties to an agreement executed in violation of the anti-trust law. There is no such situation in the case now in hand, and it is clearly distinguishable from that case. The contract between the plaintiff and the defendant in the present case contains but one feature which differentiates it from the ordinary contract of sale. This feature is called the "profit-sharing plan." It is simply nothing more nor less than an agreement on the part of the seller to divide its profit with the purchaser, provided the purchaser will give to the seller his exclusive trade. We do not see how there can be any legal objection to a contract of this nature. Certainly it is not illegal to allow the purchaser a rebate upon the purchase-price on condition that he give the seller his exclusive business. See In re Corning, 51 Fed. 205; In re Greene, 52 Fed. 105 (7). We see no objection from a legal standpoint to a manufacturer of goods offering an inducement of this sort in order to build up his business and secure the exclusive trade of a purchaser. The purchaser is not compelled to buy, and, if he buys, he does so either because he obtains better terms or because he can not get the character of goods he desires elsewhere. If he violates his agreement and fails to obtain a rebate or discount, he simply pays for the goods what

everybody else does who enters into a similar arrangement. While the great object of the Sherman act was undoubtedly to encourage competition, it never was designed to prevent the execution of legitimate contracts made to increase the business of a manufacturer. Indeed, it is very clear, from the latest expressions of opinion by the Supreme Court of the United States, that even though a manufacturer should, by the application of legitimate business methods, secure practically the exclusive sale of a commodity, this alone would not make it obnoxious to the anti-trust act. Certain it is, therefore, that this contract, made with this defendant, standing alone, is not illegal under any principle of law to which we have been referred.

Nor do we think there is anything in the answer which makes the contract illegal. It is alleged that at the time this system of profit-sharing contracts was inaugurated, the plaintiff was the sole corporation in the United States manufacturing glucose and grape sugar, having absorbed all independent and competing concerns. As we have seen, this allegation does not make the contract illegal. It is further averred that the defendants were forced to purchase from the plaintiff glucose or grape sugar upon whatever terms could be made. This allegation does not help the defendant's case. As we have said above, the mere fact that the plaintiff was the exclusive manufacturer of this commodity, and that the defendant was for this reason forced to purchase from the plaintiff, would not render the contract illegal. The main contention of the defendant seems to be that it was compelled to purchase from the plaintiff for each succeeding year, under penalty of losing the discount allowed under the contract on purchases of the previous year, and that under this system the plaintiff was enabled to maintain a monopoly of the business. We do not understand how this kind of contractual compulsion is obnoxious to the anti-trust act. At the expiration of any contract the defendants were free not to enter into another; they were free not to make further purchases from the plaintiff, and the fact that their refusal to make further purchases simply entailed a loss of the discount, offered upon condition that they would make further purchases, does not render the contract illegal. It is alleged generally in the answer that these contracts were designed for the purpose of preventing competition and did in fact have such an effect. Suppose they did.

If their terms were legitimate, and there is nothing in the contracts which would make them illegal, the fact that they may have resulted in building up the plaintiff's business to such an extent as to enable it to practically control the sale of the commodity would not render the contracts unenforceable. Indeed, the answer of the defendant in this very case shows that competition has arisen, and that the defendant can purchase the commodity from other concerns, but the defendant alleges it can not do so, because it would forfeit the discount for the period of one year allowed by the plaintiff. The defendant is at perfect liberty to purchase from these other concerns, and the presumption is that if it does not do so, it is because it can secure more favorable terms from the plaintiff. The contracts of the plaintiff in this case may have the effect of lessening or even destroying competition, but if the methods employed to bring this about are legitimate and not obnoxious to the law, the contracts are not subject to be set aside.

It is further alleged in the answer that each order for goods bought by the defendant contained a clause reciting that the goods are sold "for your own consumption only, and not for resale." A covenant by the buyer of property not to use the same in competition with the business retained by the seller has been held to be valid. United States v. Addyston Pipe & Steel Co., 85 Fed. 271, citing, Hitchcock v. Anthony, 83 Fed. 799, and American Strawboard Co. v. Holdeman Paper Co., 83 Fed. 619. If not valid, it is incapable of enforcement, and does not restrain the purchaser from reselling the goods at his pleasure. Moreover, there is another very clear distinction between this case and the Continental Wall Paper Company case. In that case written agreements between the combining corporations and firms were executed, and showed as clear a case of conspiracy to restrain interstate trade as it would be possible to conceive of. And the Supreme Court of the United States held that the contract of sale in that case was made with direct reference to and in execution of the agreements which constituted the illegal combination. No such agreements are alleged in the present case. It is simply averred that the plaintiff was made up by a combination of a number of manufacturers which were independent competing concerns, and was formed for the purpose of monopolizing and restraining interstate trade. The answer does not set forth any conspiracy agreement, nor does it

appear that there was in fact any conspiracy among these constituent companies to restrain interstate trade. But even if such illegal agreements had been entered into by the companies which combined to form the plaintiff corporation, the defendant was no party to such an arrangement; it took part in no conspiracy to restrain interstate trade, and there is nothing in the contract of sale executed by it which shows that it was made for the purpose and as a part of an unlawful conspiracy to restrain interstate trade or commerce. We are quite clear that the trial judge committed no error in striking the defendant's answer in the present case, upon the ground that it set forth no defense to the action. The answer having admitted the purchase of the goods at the price stated in the contract, it was properly stricken and judgment entered in behalf of the plaintiff for the full amount sued for.

*Judgment affirmed. Russell, J., dissents.*