## DENIAL OF JUDGMENT FOR THE FRUITS OF AN ILLEGAL CONTRACT.

Common Pleas Court of Franklin County.

### McCALL COMPANY v. PATRICK J. O'NEIL.

Decided, November 12, 1914.

*Anti-Trust Law—Violation of—By Fixing the Price at which Goods May be Resold—Recovery from the Vendee Denied—Articles Covered by Patent Covered by the Same Rule When Sold Under an Illegal Contract.*

1. The contract involved in this action undertakes to fix the price at which the goods sold may be resold by the purchaser, with a provision that for a breach of any of the terms or conditions of the contract the other party shall have the right to exercise the option to be relieved from its obligations and to recover the sum therein provided as liquidated damages. Such a contract is clearly within the inhibition of the Ohio anti-trust statute, and is therefore void; and a court will not lend its aid to a party relying on such a contract and seeking to recover its fruits, notwithstanding the purchaser may, as a consequence, be relieved from paying for goods he has received.

2. This rule with reference to contracts in violation of the anti-trust law applies with the same force in cases where the goods so sold are covered by a patent.

*Watson, Stouffer, Davis & Gearhart,* for plaintiff.
*Ralph Henney* and *M. L. Bigger,* contra.

BIGGER, J.

The action is upon an account. By agreement of the parties a jury was waived and the case is submitted to the court upon the following agreed statement of facts:

"The plaintiff is a corporation, and on or about the 13th day of May, 1910, it entered into a contract with the Davis Pennell Company, a corporation of Columbus, Ohio, which contract is hereto attached; that said contract continued to be and remained in force as between said parties until about the 13th day

of February, 1912, when said the Davis Pennell Company having sold and transferred its business, including its right and interest to and in said contract, to the defendant, said defendant assumed all the obligations of said contract on the part of said the Davis Pennell Company to be performed, including a standing credit of $100; and the plaintiff consented in writing to the said transfer of said contract and obligations to defendant. Between the 1st day of February, 1912, and December 8th, 1912, both dates inclusive, plaintiff sold and delivered to the defendant under said contract goods and merchandise of the amount and value of $379.25; that during said period defendant paid and was given credit for goods returned in the sum of $234.38, leaving a balance unpaid of $144.87; that in the month of January, 1913, defendant failed and refused to pay said sum of $144.87 and has never since paid the same or any part thereof; that upon defendant's failure to pay said sum, plaintiff exercised what it alleges as its right and option provided in said contract to be released therefrom and all future obligations arising out of the same, and gave to defendant two weeks' notice in writing to make said payments and of its intention to exercise its option to be released from the obligations of said contract and of its intention to claim liquidated damages as therein provided; that there then remained an unexpired term of said contract of thirty-one months during which, according to its terms, defendant had agreed to order thirty-one monthly issues of patterns of not less than $15 per month, amounting during said term to $465; also thirty-one monthly issues of fashion sheets consisting of 13,000 fashion sheets at $7.50 per thousand, amounting to $97.50; also thirty-one monthly issues of McCall's large catalogues, consisting of 167 numbers at 17½ cents each, amounting in all to $12.53; also thirty-one monthly issues of magazines consisting of 310 numbers at 3 cents each, amounting in all to $9.30, making the total amount of goods to be ordered by defendant and delivered by plaintiff for said unexpired term of said contract, the sum of $484.33. Plaintiff claims under the provisions of said contract and the exercise of the alleged right of option aforesaid and the giving of said notice, there then became due and owing to the plaintiff two-thirds of said sum of $494.33, or a total of $389.55; that no part of said $389.55 has been paid; that no part of said $144.87 as balance due for merchandise or no part of said $100 as a standing credit has been paid and that plaintiff claims against the defendant $634.32, with interest from February 1st, 1913.

"It is further stipulated and agreed that the McCall Company have sold all of their goods and their customers have sold all of the goods purchased from the McCall Company at catalogue retail prices, as stipulated and provided in the contract referred to herein; that defendant, O'Neil, by virtue of the contract herein sued upon could sell the patterns to be purchased under said contract at such uniform catalogue retail prices and at no other price; that the McCall Company has customers selling these patterns in every city of the United States of 10,000 inhabitants or more, at such uniform catalogue prices and at no other prices."

The contract attached is as follows:

"COLUMBUS, OHIO, 4-29, 1910.

"THE McCALL COMPANY,

"New York City, N. Y.

"Please deliver to freight at New York City, addressed to us a stock of McCall Patterns, at the uniform price of 7½ cents for each pattern (excepting those retailed for 10 cents, the price of which is 5 cents each), amounting to $200 net, including the June issue, to be paid ten days after date of shipment; also ship us each month by cheapest route not exceeding an average of $15 per month of your selection of the new monthly patterns, at same prices as above, commencing with July issue; also Fashion Sheets and other publications in quantities, and at prices specified on the reverse side of this form, during the term of this contract, commencing with June issue.

"We will re-order at the prices above named, once each week, or oftener, patterns sold, thus keeping patterns on hand as above specified. The patterns are not to be sold for other than catalogue retail prices, and the stock of patterns is to be kept and offered for sale on the first (main) floor. We will send you an inventory of our stock of patterns on hand at your request, not exceeding twice each year.

"All goods ordered for delivery after the first stock are to be paid for on or before the 5th day of the month succeeding date of shipment; if not then paid, subject to sight draft. All prices quoted are net.

"DISCARDED PATTERNS.

"All patterns purchased from you under this contract-order that are reported discarded by you semi-annually—January and

July—can be returned by us at contract price, in exchange for other patterns at full contract price, at any time within sixty days from the date such discarded patterns are respectively reported by you, provided this contract shall be in force at the time of such return. All patterns returned by us under any such discard report are to be credited to a special account, to be known as our discard exchange account, the credit to same to continue for a period of six months from the date of such discard report unless this contract shall be sooner terminated; and all patterns ordered by us within such period of six months and while this contract is in force, excepting our monthly standing order, shall be charged to such discard exchange account unless our credit to the same is earlier exhausted.

"If either of us shall intentionally break any of the above terms or conditions of this contract, and refuse or fail, after two weeks' notice in writing given by the other, promptly to perform any of said terms or conditions, then the other of us shall have the right to exercise the option of being released from all future obligations under this contract, and to recover and receive, as liquidated damages and not as penalty, a sum equal to two-thirds of the agreed charge for all goods the contract provides shall be delivered during the remaining term of the contract after the breach is committed. Failure to require compliance with the strict letter of this contract-order shall not forfeit nor prejudice any right thereunder, nor constitute a waiver thereof. Failure to pay for any shipment under this agreement for three months after the same shall become due and thereafter for two weeks subsequent to notice from you, in writing, shall be deemed an abandonment and total breach of this contract on our part, and shall entitle you to exercise the option of being released from all future obligations under this contract and to recover, as liquidated damages and not as a penalty, the sum hereinabove agreed to be paid as liquidated damages for any breach of the above terms or conditions of this contract.

"We will not transfer the stock of McCall Patterns from No. 454 E. Long Street without your written consent, and will pay all transportation charges to and from your New York Office.

"We will not sell any other patterns than the McCall Patterns received from you during the term of this contract-order.

"This contract is to remain in force from date, and for five years after first shipment of patterns, and thereafter until the expiration of three months' notice given by either party in writing, subsequent to the expiration of such five years.

"All terms are herein printed or written.  Signed in duplicate after being read.

"Date 4-29, 1910.                    Purchaser's Signature:
                    "THE DAVIS PENNELL CO.,
                        "per EARL J. PENNELL, *Sec., Treas.*

"GUARANTEE AGAINST LOSS IN PATTERNS.

"It is agreed that at the end of five years and three months from date of first shipment of patterns, provided this contract shall have continued in force so long, the above purchaser may take an invoice of the stock patterns on hand, purchased under this contract, and if the result of the business shows that the above purchaser has paid us more cash for patterns purchased under this contract than has been received for them, we will, upon demand made by such purchaser and receipt of the patterns in good salable condition at our New York Office within thirty days after the expiration of such five years and three months, pay such loss in cash, provided all terms of this contract have been complied with.

"The above contract-order is accepted subject to the approval of the home office.

"Date 4-29, 1910.

                    "THE MCCALL COMPANY,
                        "By O. L. TRAVIS."

There are some other provisions supplemental to these, but they do not in any way vary or affect the terms of the contract here recited or their legal effect.

Briefs have been submitted in which counsel have discussed at considerable length the provisions of this contract with reference to what is denominated liquidated damages; the plaintiff contending that the provision therein is really one for liquidated damages, while the defendant's counsel contends that construing the contract as a whole this provision should be held to be only in the nature of a penalty, inserted for the purpose of compelling compliance with the provisions of the contract, and therefore not enforceable.

Counsel for the defendant also presents another question, which is that this contract is one which is contrary to public policy and in contravention of the anti-trust law of this state. This question is logically first in order; for if the contract is

unenforceable there will be no occasion to consider and determine the other questions presented in argument.

It is a well settled principle of law that courts will not lend their aid to the enforcement of illegal contracts. Is this an illegal contract?

Section 6391 of the General Code provides that:

"A trust is a combination of capital, skill or acts by two or more persons, firms, partnerships, corporations or associations of persons for any or all of the following purposes: *   *   *

"4. To fix at a standard or figure, whereby its price to the public or consumer is in any manner controlled or established, an article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this state.

"5. To make, enter into, execute or carry out contracts, obligations or agreements of any kind or description, by which they bind or have bound themselves not to sell, dispose of or transport an article or commodity, or an article of trade, use, merchandise, commerce or consumption below a common standard figure or fixed value, or by which they agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure, or by which they shall in any manner establish or settle the price of an article, commodity or transportation between them or themselves and others so as directly or indirectly to preclude a free and unrestricted competition among themselves, purchasers or consumers in the sale or transporation of such article or commodity," etc.

Such combinations are declared to be unlawful, against public policy and void.

Now, this contract by its terms undertakes to fix the price at which the articles sold shall be re-sold by the purchaser. The contract then provides that for a breach of any of its terms and conditions the other party should have the right to exercise the option to be released from its obligations and to recover the sum therein provided as liquidated damages.

That such an agreement falls clearly within the inhibition of the anti-trust statute seems too clear to admit of any doubt. In its terms the price at which these articles are to be sold to the public is fixed and determined by the agreement, and they are to be sold at that price and at no other price. Clearly, this pro-

vision of the contract is unlawful under the statute of this state, contrary to public policy, and void. Unquestionably the plaintiff could not upon the agreed statement of facts call upon the court to enforce this provision of the contract. There is nothing in the agreed statement of facts to show that these articles are patented articles; but counsel for the plaintiff in argument makes the statement that the articles sold to the defendant were in fact patented articles, and asks that the plaintiff may be permitted to show that fact. After careful consideration, however, I have reached the conclusion that even if that were established it would not change the situation in so far as the right of the plaintiff to recover is concerned. It was long a mooted question as to what extent, if at all, a patentee might by agreement control the price at which the vendee might resell a patented article. This question was, however, finally settled by a decision of the Supreme Court of the United States. That court first decided in the case of Bobbs-Merrill, at 210 U. S., 339, that this right did not exist under the copyright statute, but expressly reserved its decision as to whether or not it existed under the patent law. This question was, however, finally presented for decision in the case of *Bauer & Cie* v. *O'Donnell*, 229 U. S., 1.

The following is the syllabus in that case:

"The right to make, use and sell an invented article existed without and before the passage of the patent law. The act secured to the inventor the exclusive right to make, use and vend the thing patented.

"While the patent law should be fairly and liberally construed to effect the purpose of Congress to encourage useful inventions, the rights and privileges which it bestows should not be extended by judicial construction beyond what Congress intended.

"In framing the patent act and defining the rights and privileges of patentees thereunder, Congress did not use occult phrases but in simple terms gave the patentee the exclusive right to make, use and vend his invention for a definite term of years, and a patentee may not by notice limit the price at which future retail sales may be made, such article being in the hands of a retailer by purchase from a jobber who has paid to the agent of the patentee the full price asked for the article sold.   *   *   *

"When the transfer of a patented article is full and complete,

an attempt to reserve the right to fix the price at which it shall be resold by the vendee is futile under the statute.    It is not a license for qualified use, but an attempt to unduly extend the right to vend.

"While the patent law creates to a certain extent a monopoly by the inventor in the patented article, a patentee who has parted with the article patented by passing title to the purchaser has placed the article beyond the limits of the monopoly secured by the act."

This decision puts at rest the hitherto mooted question of the right of a patentee to control the price at which the patented article may be sold where it is sold outright to a purchaser, as in the case at bar.    It being established, therefore, by this decision that the patent law of the United States does not confer this right upon patentees, it follows that such patentees are not immune by virtue of the patent law from the provision of the antitrust statute.

As I understand the argument of plaintiff's counsel, it is claimed that even if the court should conclude that this provision of the contract is illegal, that notwithstanding that, since the defendant obtained the goods he should not be permitted to escape payment by reason of this provision of the contract, and that it should have no effect upon the right to recover upon the account here sued upon.    But I can not concur in this view of the effect of this provision, having reached the conclusion that it is unlawful, contrary to public policy and void.    It is undoubtedly true that the mere fact that a vendor may be engaged in a combination in restraint of trade or tending to the establishment of a monopoly will not constitute a defense to a vendee who has purchased an article manufactured and sold by the illegal trust or combination.    If the contract of sale is collateral to and in no wise connected with the illegal agreement effecting the unlawful combination or trust, the unlawful character of the combination or trust from which the article is purchased is no defense.·    The rule is, however, different where the vendor relies upon the illegal contract for recovery, as in this case.

Authorities upon this proposition might be multiplied, at great length, but the principle is nowhere more clearly decided than

in the case of *Wall Paper Co.* v. *Voight & Sons Co.*, 212 U. S., 227.   This case is in principle a parallel to the one at bar upon this question, inasmuch as it is a suit upon an account for goods sold and delivered, and the court refused its aid to enforce the contract for the purchase price of the goods for the reason that the contract itself contained provisions which were a violation of the federal anti-trust law.   The syllabus in that case is as follows:

"Where a number of manufacturers situated in different states engaged in manufacturing an article sold in different states organize a selling company through which their entire output is sold, in accordance with an agreement between themselves, to such persons only as enter into a purchasing agreement by which their sales are restricted, the effect is to restrain and monopolize interstate and foreign trade and commerce, and is illegal under the anti-trust act of July 2, 1890."   C. 647, 26 Stat., 209; and so held in regard to a combination of wall paper manufacturers.

"While a voluntary purchaser of goods at stipulated prices under a collateral independent contract can not avoid payment merely on the ground that a vendor was an illegal combination (*Connolly* v. *Union Sewer Pipe Company,* 184 U. S., 540), a vendee of goods purchased from an illegal combination in pursuance of an illegal agreement can plead such illegality as a defense."

"The court can not lend its aid in any way to a party seeking to realize the fruits of an illegal contract; and while this may at times result in relieving a purchaser from paying for what he has had, public policy demands that a court deny its aid to carry out illegal contracts, without regard to individual interests or knowledge of the parties."

"A refusal of judicial aid to enforce illegal contracts tends to reduce such transactions."

A case reported in 9 N.P.(N.S.), 26, decided by Judge Hoffheimer of the Superior Court of Cincinnati is an interesting case.   Judge Hoffheimer in that case intimates that the rule which he states might be different in the case of patentees; but the case of *Bauer & Cie* v. *O'Donnell, supra,* was not decided at that time.   The only rights which a patentee has in the manufacture and sale of the articles covered by his patent which are different from the rights of other manu-

facturers and sellers are derived from the patent law. If immunity be not found in the terms of the patent law, then he is amenable to the provisions of the anti-trust law, and can no more enforce such a contract than can any other vendor.

In the case of *Bauer & Cie* v. *O'Donnell, supra,* Justice Harlan in distinguishing the case of *Conolly* v. *Union Sewer Pipe Company* from the case at bar, says at page 260:

"The present case is plainly distinguishable from the Conolly case. In that case the defendant who sought to avoid payment for the goods purchased by him under contract had no connection with the general business or operation of the alleged illegal corporation that sold the goods. He had nothing whatever to do with the formation of that corporation, and could not participate in the profits of its business. His contract was to take certain goods at an agreed price, nothing more, and was not in itself illegal, nor a part of, nor in execution of any general plan or scheme that the law condemns. * * * The case before us is an entirely different one. The Continental Wall Paper Company seeks in legal effect the aid of the court to enforce a contract for the sale and purchase of goods, which it is admitted by the demurrer was in fact and was intended by the parties to be based upon agreements that were and are essential parts of an illegal scheme."

Neither the Supreme Court of the United States nor the Supreme Court of Ohio ever decided that a patentee had a right by virtue of his patent to enter into a contract of this character. On the contrary, the Supreme Court of this state in the early case of *Jordan* v. *The Overseers of Dayton,* 4 Ohio, 295, decided, as did the Supreme Court of the United States, that the sole object and purpose of the patent law was to enable a patentee to prevent others from using his patented article without his consent, but that his own right of using the patented article was not enlarged by the patent law. And the court further decided in that case that the right of a patentee to the use of his patent was subservient to the paramount claims and interests of society at large, just as the right of any other owner in and to the use of his property is subservient to such paramount rights of the public. That decision has never been overruled in Ohio; but on the

contrary the same doctrine has been since substantially announced in the cases of *State* v. *Telephone Co.,* 36 O. S., 311, and *Todd* v. *Wick,* 36 Ohio, 370, the court in the latter case saying that "the right of property in a patented invention or discovery and a right of property in any other article or thing which is the subject of ownership are the same."

The anti-trust law of this state had been on the statute books for many years before this contract was entered into, and by the terms of that statute such contracts were declared to be unlawful in this state, against public policy and void.

For the reasons stated, I have reached the conclusion that the court can not lend its aid to the enforcement of this contract. As is said in *Wall Paper Co.* v. *Voight & Sons, supra:*

"The court can not lend its aid in any way to a party seeking to realize the fruits of an illegal contract; and while this may at times result in relieving a purchaser from paying for what he has had, public policy demands that the court deny its aid to carry out illegal contracts, without regard to individual interests or knowledge of the parties."

An entry may be drawn in accordance with this finding and judgment.